USCA1 Opinion

 

 February 14, 1996 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1777 DANA BLACKIE, ET AL., Plaintiffs, Appellants, v. STATE OF MAINE, ET AL., Defendants, Appellees. _________________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued on January 30, 1996, is corrected as follows: On page 3, line 5, change "them" to "the holders of those positions." On page 18, line 15, change "some level" to "some degree" UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1777 DANA BLACKIE, ET AL., Plaintiffs, Appellants, v. STATE OF MAINE, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _________________________ John R. Lemieux for appellants. _______________ Peter J. Brann, Assistant Attorney General, with whom Andrew ______________ ______ Ketterer, Attorney General, and Thomas D. Warren, Assistant ________ _________________ Attorney General, were on brief, for appellees. _________________________ _________________________ SELYA, Circuit Judge. In this appeal, several SELYA, Circuit Judge. _______________ probation officers employed by the State of Maine seek to evade the consequences of what they belatedly deem to be a Faustian bargain. The district court thought the probation officers' claim took too much license, and rejected it. See Blackie v. ___ _______ Maine, 888 F. Supp. 203 (D. Me. 1995). The plaintiffs appeal.1 _____ We affirm. I. BACKGROUND I. BACKGROUND The subsidiary facts are not in serious dispute. Beginning in 1978, collective bargaining agreements between the State of Maine and certain state workers stipulated that those employees whose positions demanded that they work non-standard hours, i.e., irregular schedules exceeding forty hours per week, instead of, say, regular 9:00-to-5:00 shifts, would receive a sixteen percent premium over and above their base pay (but no overtime compensation). Probation officers' jobs satisfied this definition and therefore carried an entitlement to the pay premium. In 1985, the United States Supreme Court handed down a resipiscent decision in which it confessed error, reversed prior precedent, and held that the wage and hour provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. 201-219, applied to state  ____________________ 1The plaintiffs, appellants here, occupy positions that are variously classified as "Probation Parole Officer/Juvenile Caseworker" and "Probation Parole Officer II." Because the distinction between these positions makes no difference for present purposes, we refer to the plaintiffs simply as "probation officers." 3 employers. See Garcia v. San Antonio Metro. Transit Auth., 469 ___ ______ _________________________________ U.S. 528, 555-57 (1985). Maine promptly evaluated its work force to determine which state jobs came under the FLSA's overtime compensation provisions and which did not. After concluding that many positions within the law enforcement services bargaining unit of the Maine State Employees Association (the Union) were FLSA-covered, the State negotiated side agreements with the holders of those positions. In general, these pacts eased the transition by confirming the affected workers' eligibility for overtime compensation, increasing their base salaries by an average of four percent, and eliminating the sixteen percent non- standard pay premium. The State concluded, however, that the probation officers fell within an FLSA exemption for professional employees, see 29 U.S.C. 213(a)(1), and therefore permitted ___ them to retain their wonted status. Consequently, probation officers continued to receive the pay premium (but no overtime compensation). In negotiations leading to the adoption of a collective bargaining agreement (CBA) to take effect in 1986, the State and the Union locked horns over the interplay between FLSA-mandated overtime compensation and the non-standard pay premium. The probation officers set out to secure guaranteed payment of the premium for the life of the contract, regardless of their status under the FLSA. The State balked. Eventually, the parties resolved the impasse by agreeing to the non-standard workweek article reprinted in the appendix. 4 Several years passed. Then, on December 18, 1992, a cadre of probation officers sued the State seeking the shelter of the FLSA. One year and three days later, the district court vindicated the probation officers' right to receive time-and-one- half overtime compensation under the federal law. See Mills v. ___ _____ Maine, 839 F. Supp. 3, 4-5 (D. Me. 1993). The State eschewed an _____ appeal. Instead, on January 3, 1994, Nancy Kenniston, the director of Maine's Bureau of Human Resources (BHR), notified all probation officers (including those who had not participated in the Mills litigation) that they would no longer receive the pay _____ premium. The State reasoned that, under the terms of the non- standard workweek article, job classifications had to meet three enumerated criteria to qualify for non-standard status; the lack of FLSA coverage constituted one such criterion; Mills _____ established juridically that the probation officers did not fulfill this criterion, i.e., they did not occupy "[p]ositions in a classification . . . exempt for overtime compensation from the FLSA"; and, having lost their non-standard status, the probation officers had also lost their entitlement to the pay premium. The Union countered this reclassification by proposing a side agreement similar to those entered into between the State and certain other bargaining units nearly a decade earlier. On February 2, 1994, Kenneth Walo, director of Maine's Bureau of Employee Relations, rejected this overture because the CBA expressly addressed the linkage between FLSA coverage status and the non-standard pay premium a circumstance that did not obtain 5 when the State negotiated the earlier pacts and because the CBA's "zipper clause" made it pellucid that the parties had no obligation to renegotiate matters so addressed.2 Stymied by this turn of events, several probation officers sued a phalanx of defendants (collectively, the State) under the FLSA's anti- retaliation provision.3 They charged, inter alia, that the _____ ____ State's decision to eliminate the pay premium while at the same time abjuring a side agreement constituted acts of reprisal provoked by the probation officers' successful crusade for FLSA overtime pay. The State denied the allegations. After the parties cross-moved for summary judgment, the district court granted the State's motion. As to the lost pay premium, the court concluded that the bargained language of the  ____________________ 2The zipper clause states: Each party agrees that it shall not attempt to compel negotiations during the term of this agreement on matters that could have been raised during the negotiations that preceded this agreement, matters that were raised during the negotiations that preceded this agreement, or matters that are specifically addressed in this agreement. Maine's Supreme Judicial Court has given such clauses full force and effect. See, e.g., Bureau of Employee Relations v. AFSCME, ___ ____ ____________________________ ______ 614 A.2d 74, 77 (Me. 1992). 3The statute provides in part that no employer may discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]. 29 U.S.C. 215(a)(3). 6 CBA, as opposed to any retaliatory animus, compelled the result. See Blackie, 888 F. Supp. at 207. As to the State's spurning of ___ _______ a side agreement, the court held that this rebuff did not constitute an adverse employment action under the FLSA. See id. ___ ___ at 208. This appeal ensued. II. ANALYSIS II. ANALYSIS The district court's closely reasoned opinion mortally wounds the arguments that the appellants parade before us. Thus, we affirm the judgment largely for the reasons already articulated, adding only the finishing touches. First: The appellants labor to convince us that the First: _____ parties' disagreement over the meaning of the non-standard workweek article forestalls the entry of summary judgment. Their labors are both unproductive and unpersuasive. Of course, summary judgment is appropriate only if the record reveals no genuine issue of material fact and the movant demonstrates an entitlement to judgment as a matter of law. See ___ Fed. R. Civ. P. 56(c); see also McCarthy v. Northwest Airlines, ___ ____ ________ ___________________ Inc., 56 F.3d 313, 315 (1st Cir. 1995) (collecting cases); ____ National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 _________________________ _______________ (1st Cir.), cert. denied, 115 S. Ct. 2247 (1995). Under this _____ ______ standard, "a party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." 7 National Amusements, 43 F.3d at 735. Nonetheless, genuineness ___________________ and materiality are not infinitely elastic euphemisms that may be stretched to fit whatever pererrations catch a litigant's fancy. In the lexicon of Rule 56, "genuine" connotes that the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party, and "material" connotes that a contested fact has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant. See United States v. One Parcel ___ _____________ __________ of Real Property (Great Harbor Neck, New Shoreham, R.I.), 960 ____________________________________________________________ F.2d 200, 204 (1st Cir. 1992). The happenstance that both parties move simultaneously for brevis disposition does not, in ______ and of itself, relax the taut line of inquiry that Rule 56 imposes. "Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn." EEOC v. Steamship Clerks Union, Local ____ ______________________________ 1066, 48 F.3d 594, 603 n.8 (1st Cir.), cert. denied, 116 S. Ct. ____ _____ ______ 65 (1995). Matters of law, however, are for the court to resolve. See Stauble v. Warrob, Inc., 977 F.2d 690, 693 (1st ___ _______ _____________ Cir. 1992). In this instance, the appellants confuse matters of fact with matters of law. It is for the court, not the jury, to ascertain whether the terms of an integrated agreement are unambiguous, and if so, how to construe those terms. See Allen ___ _____ v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992). "In this ____________ 8 sense, questions about the meaning of contractual provisions are questions of law, and we review the district court's answers to them de novo." United States Liab. Ins. Co. v. Selman, 70 F.3d ____________________________ ______ 684, 687 (1st Cir. 1995). The appellants try to bypass these familiar rules by portraying the non-standard workweek article as freighted with ambiguity. But a contract is not ambiguous merely because a party to it, often with a rearward glance colored by self- interest, disputes an interpretation that is logically compelled. See FDIC v. Singh, 977 F.2d 18, 22 (1st Cir. 1992). Nor must a ___ ____ _____ contract "negate every possible construction of its terms in order to be unambiguous." Triple-A Baseball Club Assocs. v. ________________________________ Northeastern Baseball, Inc., 832 F.2d 214, 220 (1st Cir. 1987) ___________________________ (quoting Waxler v. Waxler, 458 A.2d 1219, 1224 (Me. 1983)), cert. ______ ______ _____ denied, 485 U.S. 935 (1988). Rather, a contract is ambiguous ______ only when its terms lend themselves to more than one reasonable __________ interpretation. See Fashion House, Inc. v. K Mart Corp., 892 ___ ____________________ _____________ F.2d 1076, 1083 (1st Cir. 1989); RCI Northeast Servs. Div. v. __________________________ Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987); American __________________ ________ Policyholders' Ins. Co. v. Kyes, 483 A.2d 337, 340 (Me. 1984). _______________________ ____ The specific provision at issue here the non-standard workweek article most assuredly is not a model of syntax; indeed, it appears to create a tautology in defining which classes of employees qualify for the non-standard pay premium. Yet the circle formed by the contract language is virtuous rather than vicious, and does not render the text ambiguous. Read as a 9 whole, the article can sustain only one reasonable interpretation. Section 1 provides that the employee classifications listed in section 3 (e.g., probation officers) must meet each of three criteria (exemption from FLSA coverage, elongated workweek, irregular work schedule) to qualify as non- standard positions. Section 2 merely makes explicit what is implicit in a combined reading of the other two sections: the State's power to delete an employment category from non-standard status once it appropriately determines that the employees within that category are not exempt from the FLSA. The short of it is that, under the terms of the article, FLSA coverage and non- standard status are mutually exclusive. Accordingly, the FLSA overtime matrix and the non-standard pay premium are mutually exclusive methods of remuneration. The appellants challenge this seemingly straightforward construction by training their sights single-mindedly on section 3. Doing enormous violence to context, they suggest that because certain job classifications enumerated in section 3 are designated therein as "meeting the above criteria," those jobs are frozen into place (and, thus, entitled to receive the pay premium) for the duration of the CBA. This infrigidated reading melts under the most mild scrutiny. It is hornbook law that an interpretation which gives effect to all the terms of a contract is preferable to one that harps on isolated provisions, heedless of context. See Smart v. ___ _____ Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st ________________________________________ 10 Cir. 1995); Fashion House, 892 F.2d at 1084; Salmon Lake Seed Co. _____________ ____________________ v. Frontier Trust Co., 153 A. 671, 672 (Me. 1931). Since the __________________ whole of an integrated agreement ordinarily should be considered in order to determine the meaning of any individual part, the appellants' Cyclopic reading of section 3 a reading that not only ignores but also flatly contradicts sections 1 and 2  cannot be countenanced. If the parties intended to guarantee the probation officers a pay premium for the life of the CBA, sections 1 and 2 would be totally superfluous (and, indeed, at cross-purposes). To sum up, the district court appropriately treated the non-standard workweek article as unambiguous, gave its terms their plain and ordinary meaning, and did not err in interpreting it favorably to the State at the summary judgment stage. Second: The appellants trumpet that summary judgment Second: ______ should have entered in their favor because the State admittedly eliminated the probation officers' pay premium in response to the Mills lawsuit. Because this ipse dixit relies upon a contorted _____ ____ _____ view of the law, we reject it. A A The FLSA's anti-retaliation provision prohibits an employer from penalizing an employee who seeks to enforce rights guaranteed by the federal law. See 29 U.S.C. 215(a)(3). ___ Although the framework for proving that an employer took an eye for an eye can vary depending upon the evidence available to show retaliatory animus, cf. Fields v. Clark Univ., 966 F.2d 49, 51-52 ___ ______ ___________ 11 (1st Cir. 1992) (elucidating this point in the Title VII environment), cert. denied, 113 S. Ct. 976 (1993), the elements _____ ______ of a retaliation claim remain much the same. They comprise, at a minimum, a showing that (1) the plaintiff engaged in statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in the protected activity. See Mesnick v. General Elec. ___ _______ _____________ Co., 950 F.2d 816, 827 (1st Cir. 1991), cert. denied, 504 U.S. ___ _____ ______ 985 (1992); York v. City of Wichita Falls, 944 F.2d 236, 239-41 ____ ______________________ (5th Cir. 1991) (York I); Connell v. Bank of Boston, 924 F.2d _______ _______ ______________ 1169, 1179 (1st Cir.), cert. denied, 501 U.S. 1218 (1991); _____ ______ Petitti v. New Eng. Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. _______ _________________________ 1990). The third element is of pivotal importance in this case. Under it, a plaintiff must proffer evidence from which a reasonable factfinder could infer that the employer retaliated against him for engaging in the protected activity. See Mesnick, ___ _______ 950 F.2d at 828. In other words, the record must enable the trier plausibly to find that "a causal connection existed between _______ the protected conduct and the adverse action." Id. at 827 ________________________________________________ ___ (emphasis supplied) (citing Connell, 924 F.2d at 1179). _______ The appellants easily demonstrated the first two elements of their prima facie case; it is uncontested that they engaged in a protected activity (filing suit under the FLSA) and that the State subsequently took an adverse employment action (eliminating the non-standard pay premium). On the third element the appellants made a much more tenuous showing: they limned a 12 close temporal link the change in classification followed hot on the heels of the Mills decision and produced evidence of _____ statements by certain officials to the effect that the district court's order in Mills led to the State's decision to reclassify _____ the probation officers and revoke their pay premium.4 As we elucidate below, this evidence, taken most hospitably to the appellants, fails to create a genuine question of material fact in respect to the third element of their cause of action. B B The fundamental flaw in the appellants' argument is that it depends on applying a black-letter legal rule in a purely mechanical fashion, divorced from considerations of policy and logic. They begin, auspiciously enough, with the proposition that the FLSA prohibits an employer from taking an adverse employment action because an employee participates in a protected activity. They then observe that the State scrapped the pay premium because of the Mills lawsuit. On this basis, they assert _____ that the State violated the FLSA. This is a non sequitur: one plus one does not equal three. The appellants' argument assumes that the FLSA's ban on retaliating against an employee who engages in a protected activity is the functional equivalent of a straightjacket which  ____________________ 4The State contends that these statements are immaterial because none of them was attributable to the actual decisionmaker (Kenniston). See, e.g., Medina-Munoz v. R.J. Reynolds Tobacco ___ ____ ____________ ______________________ Co., 896 F.2d 5, 10 (1st Cir. 1990). We need not pursue this ___ point because even if the statements are probative of the matter asserted an issue on which we express no opinion they are insufficient to turn the tide. 13 restrains an employer from responding on the basis of its business judgment to the outcome brought about by the protected _______ activity. We disagree with this assumption. The FLSA like other anti-retaliation laws does not immobilize employers in this manner. An employer may reorganize its affairs and take other necessary employment actions in order to manage the impact of compliance with the outcomes produced by a protected activity so long as it does so for legitimate reasons and not in reprisal for the fact of an employee's participation. See, e.g., York v. ____ ___ ____ ____ City of Wichita Falls, 48 F.3d 919, 920-21 (5th Cir. 1995) (York ______________________ ____ II) (finding no retaliation under the FLSA when city restructured __ compensation arrangements "to comply with Garcia and the FLSA ______ within existing budgetary constraints"); Adams v. City of _____ ________ McMinnville, 890 F.2d 836, 839 (6th Cir. 1989) (similar). A ___________ contrary rule would mummify the status quo and prevent an employer from complying with a court order in the manner that it deems most compatible with the lawful operation of its business. Nothing in the FLSA even remotely suggests this grotesque result. Recognizing this abecedarian principle leads to the following conclusion. The anti-retaliation provision mandates that an employer must put to one side an employee's lawful efforts to secure rights assured by the FLSA. At the same time, the statute does not foreclose the employer from exercising its business judgment simply because doing so may affect an employee who successfully asserted FLSA-protected rights. The other side of the coin, of course, is that by 14 engaging in a protected activity an employee does not acquire immunity from the same risks that confront virtually every employee every day in every work place. The FLSA is neither a shield against legitimate employer actions nor a statutory guaranty of undiluted compensation, come what may. This case aptly illustrates the point: applying the anti-retaliation provision as the appellants ask would bar the employer from enforcing a valid preagreed contractual provision specifically negotiated to guard against the very eventuality a change in the parties' status that the appellants subsequently labored to achieve. That is not the law. C C The appellants' thesis suffers from another infirmity as well. The thesis necessarily depends on the existence of some evidence that the statutorily protected activity (i.e., the appellants' instigation of, and participation in the Mills _____ litigation) furnished the motive driving the State's execution of the adverse employment action (i.e., the shift in classification). We agree with the lower court that the record contains no such evidence. The CBA provides in substance that probation officers will receive the non-standard pay premium as long as they remain, among other things, exempt from coverage under the FLSA's overtime pay provisions. Once Mills established that the _____ probation officers were not so exempt, the CBA dictated that the 15 non-standard pay premium be eliminated.5 The State's decision to abolish the pay premium applied equally to all probation officers, regardless of whether they had joined the Mills _____ plaintiffs. What is more, that decision was taken in response to the Mills ruling only in the sense that the State believed _____ itself obligated to follow both the letter and the spirit of the federal court's decree. There is simply no basis for a reasoned inference that the State's reliance on the CBA was a pretext for retaliation. In a nutshell, then, the State plainly changed the appellants' classification for a nondiscriminatory reason, namely, to implement the terms of a contract that required the State to eliminate the pay premiums to match the recipients' status vis-a-vis the FLSA. That the State's action took place because of a judicial declaration of the appellants' status, brought about by the appellants' suit, neither transforms the character of the action nor renders it per se unlawful under the FLSA. For aught that appears, the State would have taken the same action regardless of the presence or absence of retaliatory animus.  ____________________ 5The appellants argue that the letter of the CBA did not require the BHR to reclassify their positions merely because the federal district court had so ruled. This amounts to little more than whistling past the graveyard. Once the federal court had spoken, state officials were duty bound to enforce the State's rights under the terms of the CBA in order to protect the public fisc especially where, as here, the CBA expressly addressed the situation. And, moreover, the appellants had no possible reason to anticipate that the State would refrain from exercising its explicitly reserved rights under the CBA. 16 Third: Next, the appellants bombard the CBA itself. Third: _____ They have lately come to the view that a contract which permits the State to forgo the non-standard pay premium whenever a court determines that a class of employees is not exempt from FLSA coverage is an abomination, and thus unenforceable. This barrage is fired from two different directions. Both volleys land well wide of the mark. A A The appellants asseverate that if the terms of the CBA ensure that a successful FLSA suit inevitably will result in ending the pay premium, then the CBA contains a veiled threat against pursuing FLSA rights and is per se retaliatory. The asseveration lacks force. The CBA leaves no room to doubt that the State bestowed the non-standard pay premium on the probation officers in lieu of overtime compensation.6 It simply is not retaliatory for an employer and an employee to agree to alternative methods for compensating overtime work based on the latter's coverage status  ____________________ 6Based on actions taken by the Mills court, the appellants _____ contend that the sixteen percent pay premium comprised part of their base wage rate. This contention is disingenuous. While the Mills court included the pay premium in the probation _____ officers' "regular rate of pay," see Mills v. Maine, 853 F. Supp. ___ _____ _____ 551, 554 (D. Me. 1994), it did so solely as part of calculating the probation officers' damages under the FLSA. That damage computation has no bearing on the contractual question of whether the parties intended the premium to be a surrogate for overtime compensation. 17 under the FLSA.7 See, e.g., Walling v. Belo Corp., 316 U.S. ___ ____ _______ ___________ 624, 630 (1941) (holding that "nothing in the [FLSA] bars an employer from contracting with his employees to pay them the same wages that they received previously"); Anderson v. Bristol, 6 ________ _______ F.3d 1168, 1173 (6th Cir. 1993) (holding that the FLSA "does not prohibit changes in wage rates; it prohibits the payment of overtime at less than one and one-half times the regular wage rate"); Adams, 890 F.2d at 839 (finding no retaliation when city _____ altered employees' compensation structure to offset budgetary impact of Garcia decision). ______ B B The appellants also claim that the either-or proposition contained in the non-standard workweek article amounts to an unenforceable waiver of their FLSA rights. See ___ Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, __________ __________________________________ 745-46 (1981) (holding that employees may not contract away their FLSA rights). This is an old whine in a new bottle. As Judge Hornby observed, see Blackie, 888 F. Supp. at 207, the appellants ___ _______ enjoyed the full panoply of rights secured to them by the FLSA.  ____________________ 7The appellants bewail the fact that their take-home pay may decrease under the new format. This herring is very red. If there is a decrease, the record contains nothing to suggest that it will be brought about by anything other than the State's efforts to contain overtime. Though the FLSA requires an employer to pay a covered employee time-and-one-half for overtime work, the employee has no vested entitlement to such work. See ___ Adams, 890 F.2d at 840; see also Joint Explanatory Statement of _____ ___ ____ the Committee of the Conference, H.R. Conf. Rep. No. 357, 99th Cong., 1st Sess. 8 (1985), reprinted in 1985 U.S.C.C.A.N. 651, _________ __ 670. In any event, the pivotal issue here is not the degree of the appellants' alleged harm, but whether the State retaliated against them at all. 18 Indeed, they successfully prosecuted their action and, as a consequence, stand to recover substantial damages.8 Fourth: Shifting gears, the appellants posit that the Fourth: ______ State's refusal to negotiate a side agreement with them comparable to the pacts entered into between the State and other law enforcement bargaining units in the wake of Garcia ______ constitutes an unlawful reprisal under the FLSA. We think not. In a retaliation case, as in virtually any other employment discrimination case premised on disparate treatment, it is essential for the plaintiff to show that the employer took a materially adverse employment action against him. See, e.g., ___ ____ York I, 944 F.2d at 239-41; Spring v. Sheboygan Area Sch. Dist., ______ ______ __________________________ 865 F.2d 883, 885 (7th Cir. 1989). Determining whether an action is materially adverse necessarily requires a case-by-case inquiry. See Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994); ___ _____ _________ see also 2 Lex K. Larson, Employment Discrimination 34.04 (2d ___ ____ ed. 1994). Moreover, the inquiry must be cast in objective terms. Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action. Withal, some degree of generalization can be attempted. Typically, the employer must either (1) take something of  ____________________ 8The appellants attempt to blunt this thrust by arguing that the State will use the savings from its elimination of the non- standard pay premium to fund the damage award. This is beside the point. How the State chooses to spend any savings it realizes from eliminating the premium is the State's business. 19 consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, see Crady v. Liberty Nat. Bank & Trust Co., 993 ___ _____ _____________________________ F.2d 132, 136 (7th Cir. 1993); Connell, 924 F.2d at 1179, or (2) _______ withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service, see, e.g., Hishon v. King & Spalding, 467 U.S. 69, 75-76 ___ ____ ______ _______________ (1984). Thus, the first employment action of which the appellants complain altering the probation officers' status in a way that rendered them ineligible for the preexisting sixteen percent pay premium constituted a materially adverse taking (albeit not an actionable one because it was not retaliatory in nature). But the second employment action to which the appellants advert the State's unwillingness, in the aftermath of Mills, to negotiate a side agreement with them does not rise _____ to the level of a materially adverse action. We explain briefly. The appellants hinge their claim on the notion that past practice created an expectation that, when the FLSA became applicable to a particular position, the State would negotiate a side agreement. By refusing to follow this practice, the thesis runs, the State deprived the appellants of their expectancy. We agree that under certain circumstances an employer's inaction can operate to deprive an employee of a privilege of employment that an employee had reason to anticipate he would receive; in those situations, the deprivation constitutes an adverse employment 20 action. See, e.g., Hishon, 467 U.S. at 75-76; Petitti, 909 F.2d ___ ____ ______ _______ at 32. But trying to fit this case within the contours of that doctrine is like trying to fit a square peg snugly into a round hole. Here, the presence of the non-standard workweek article accomplished two things: (1) it relieved the State of any obligation to dicker in the event of a change in the probation officers' FLSA status; and (2) it effectively dashed any realistic expectation that the State would negotiate a side agreement in the event of a change in FLSA status (especially since the CBA's zipper clause, see supra note 2, specifically ___ _____ relieves both parties of any duty to renegotiate contract provisions in midstream). Accordingly, the appellants' professed expectancy is only wishful thinking. If this were not enough, the historical parallel that the appellants draw is not a parallel at all. It conveniently ignores the fact that, when the State negotiated side agreements nearly a decade earlier, the CBA then in effect did not address the interplay of FLSA overtime and the non-standard pay premium. By contrast, the contemporaneous CBA expressly defines this relationship and indicates the results that will flow from a change in status. To put it plainly, the circumstances had changed so dramatically that the appellants step into quicksand once they march under the banner of past practice. To say more would be to knight a monarch. On the facts of this case, the State's decision to abjure a side agreement did 21 not constitute an adverse employment action. It follows inexorably, as night follows day, that the appellants have failed to validate this aspect of their claim.9 III. CONCLUSION III. CONCLUSION We need go no further. Having agreed to the elimination of their pay premium if found to be eligible for FLSA overtime compensation, the appellants have no right to complain that, when they pressed, the State held them to their bargain. Affirmed. Affirmed. ________  ____________________ 9We have remarked, time and again, that irony is no stranger to the law. See, e.g., United States v. LaBonte, 70 F.3d 1396, ___ ____ _____________ _______ 1401 n.1 (1st Cir. 1995); Amanullah v. Nelson, 811 F.2d 1, 18 _________ ______ (1st Cir. 1987). This case provides yet another example. When the Mills plaintiffs first sued, the State offered to discuss a _____ settlement predicated on a side agreement, but the Union's lawyer (now counsel for the plaintiffs in this case) turned a deaf ear. 22 APPENDIX APPENDIX [Note: This provision is excerpted from the 1986-87 CBA. The parties represent that all subsequent iterations of the CBA (including the 1993-95 version, which was in force when the current controversy developed) contain substantially identical language.] C. Non-Standard Workweek 1. Classifications listed in Section 3 which meet the following criteria shall be designated as non- standard: (a) Positions in a classification have been determined by the [BHR] to be exempt for overtime compensation from the [FLSA]; (b) Employees are required by working conditions to work a variable workweek in excess of forty (40) hours; and (c) Employees' workweek are [sic] irregular and work hours cannot be scheduled or determined except by the employee. 2. Employees in a classification which is designated as non-standard shall be compensated at a rate of sixteen percent (16%) above the basic rates in their salary grades, except that any position that is found by the [BHR] not to be exempt from the Fair Labor Standards Act for overtime compensation purposes shall not be designated non-standard. 3. The following classes are designated as meeting the above criteria: Forest Ranger IV Game Warden Pilot Marine Patrol Pilot Probation Parole Officer/Juvenile Caseworker Probation Parole Officer II Special Agent Investigator Special Investigator State of Maine-Maine State Employees Association Agreement, Law Enforcement Services, Art. 10.C. at 13-14 (1986-1987), reprinted _________ in Blackie, 888 F. Supp. at 205. __ _______ 23