Blackden v. Stanley, et al.          CV-02-475-M    12/31/03
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Brian Blackden,
      Plaintiff

      v.                                    Civil No. 02-475-M
                                            Opinion No. 2003 DNH 225
Phil Stanley, Jane Coplan,
Dave O'Brien, Richard Gerry,
and the New Hampshire
Department of Corrections,
      Defendants


                          **O R D E R**


      Brian Blackden, a former employee of the New Hampshire

Department of Corrections ("DOC"), has sued in three counts.  He

first asserts a federal claim under 42 U.S.C. § 1983, alleging

that defendants violated his First Amendment right to free speech

by subjecting him to various unfounded investigations, resulting

in his constructive discharge in retaliation for speaking out on

various issues related to his work at the New Hampshire State

Prison ("NHSP") (Count I).  He also asserts two state law claims:

that defendants violated his rights under the New Hampshire

Whistleblower's Protection Act (Count II), and are liable to him

under the common law for intentionally inflicting emotional

distress (Count III).  Before the court is defendants' motion for

summary judgment.  Plaintiff objects.  For the reasons given below, the motion for summary judgment is granted.

## Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact."  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)).

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine."  In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

2

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Navarro, 261 F.3d at 94 (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

## Background

The facts described by the parties are numerous, and the history is complicated, but the material facts are not disputed. Accordingly, the factual background will be briefly summarized here, and referred to in greater detail later, as necessary.

3

Brian Blackden was employed by DOC from 1997 until his resignation – which he characterizes as a constructive discharge – on October 1, 2002. He worked initially as an internal affairs investigator in the Investigations Unit, but was subsequently demoted to the position of sergeant in the Training Unit. His demotion, effective January 4, 2002, came about as part of a negotiated settlement of several grievances he brought against DOC, described in greater detail below.

During the course of his employment, Blackden engaged in the following expressive conduct: (1) during the spring of 2001, he discussed the "Edwards investigation"[1] with defendants Dave O'Brien,[2] Richard Gerry,[3] and Jane Coplan;[4] (2) on June 21, 2001, Blackden advised Coplan of his concerns about how the Edwards investigation was being handled by various NHSP and DOC

---

[1] The Edwards investigation involved allegations of illegal activity conducted jointly by an inmate and an NHSP employee.

[2] O'Brien was the Deputy Chief of the NHSP Investigations Bureau.

[3] Until May 2001, Gerry served as administrator of security at the NHSP. In that position, he supervised the Investigations Unit. Between September 2000 and March 2001, he served as acting warden.

[4] Coplan has been the warden of the NHSP since March 2001.

officials; (3) on June 26 or 27, 2001, he gave Coplan a letter discussing his concerns (Defs.' Mot. Summ. J., Ex. E.); (4) on July 12, 2001, he gave Coplan a second, more detailed letter, and provided a copy to Phil Stanley[5] (Defs.' Mot. Summ. J., Ex. F.); (5) on October 10 and 24, 2001, Blackden testified before the Criminal Justice Committee of the New Hampshire House of Representatives and discussed the Edwards investigation as well as various other instances of alleged misconduct by DOC staff members; (6) on August 25, 2002, Blackden gave a taped interview to the chair of the Criminal Justice Committee related to the "Dematteo investigation";[6] and (7) in August and September of 2002, he testified informally at other legislative hearings and spoke with individual legislators about the Dematteo investigation and a variety of other topics.[7]

---

[5] Stanley served as Commissioner of DOC.

[6] The Dematteo investigation involved allegations that an inmate had set up a telephone fraud operation from inside the NHSP.

[7] There is no question that some defendants were, contemporaneously, aware of each of the first five instances of Blackden's expressive conduct. The last two, however, are a different matter. In his complaint, plaintiff asserts, on information and belief, that the substance of his August 25, 2002, taped interview was communicated to Stanley and, perhaps, other defendants. (Compl. ¶ 59.) He makes a similar assertion, on information and belief, that Stanley became aware of the

According to plaintiff, the following acts by various DOC personnel qualify as adverse employment actions taken in retaliation for his having exercised his First Amendment rights: (1) investigating whether he violated state law or DOC policy by offering for sale over the internet (on eBay) certain uniform patches he had designed and manufactured for the Investigations Unit;[8] (2) investigating whether he violated state law or DOC policy when he used a blue light associated with law enforcement on his personal vehicle while responding to an escape from the NHSP;[9] (3) investigating whether he violated DOC policy when he

_____

informal testimony he gave to other legislators in August and September. (Compl. ¶ 61.) Those assertions, however, do not appear in plaintiff's affidavit in support of his objection to summary judgment. Stanley admits that he received a transcript of Blackden's taped interview at some point, but the record does not indicate when. (Stanley Dep. at 78.) Stanley denies that he ever learned about Blackden's conversations with other legislators. (Stanley Dep. at 79.)

[8] The "patch investigation" was initiated on June 18, 2001, when another DOC staff member brought the eBay auction to Gerry's attention. It culminated in a report, dated August 22, 2001 (Defs.' Mot. Summ. J., Ex. H), which included a finding that Blackden had violated two New Hampshire statutes and two DOC Policy and Procedure Directives ("PPDs").

[9] The "blue-light investigation" was initiated in response to a June 22, 2002, complaint from Chief Fiske of the Loudon Police Department (Defs.' Mot. Summ. J., Ex. G). It culminated in a report dated September 5, 2001 (Defs.' Mot. Summ. J., Ex. I), which included a finding that plaintiff had violated one PPD. Defendants have produced a copy of the September 5 report, which

took several "shanks" from the NHSP evidence locker;[10] (4) assigning him menial make-work tasks, isolating him from DOC staff, and ignoring him at staff meetings during the winter/spring of 2001 and 2002; (5) investigating whether he violated state law or DOC policy by slandering New Hampshire State Trooper Michael Nolan;[11] (6) initiating an investigation into whether he had violated state law or DOC policy in the issuance of a subpoena during the course of the Dematteo investigation;[12] (7) generally making his working environment so

states that "[i]t is clear that current policy 5.57 . . . was violated." Plaintiff's statement to the contrary in his affidavit (Blackden Aff. ¶ 20) is insufficient to create a triable question of material fact.

[10] The "shank investigation" was initiated in October of 2001. It culminated in a report dated January 23, 2002 (Defs.' Mot. Summ. J., Ex. P), that included a finding that Blackden had violated two PPDs. That report, however, did not result in any further disciplinary action against Blackden.

[11] The "slander investigation" was initiated in response to a request for a formal investigation from Captain Craig Wiggin of the New Hampshire State Police dated June 18, 2002 (Defs.' Mot. Summ. J., Ex. Q). It culminated in a report dated August 7, 2002 (Defs.' Mot. Summ. J., Ex. R), that included a finding that "[t]here was no substantial evidence that Mr. Brian Blackden made any slanderous statements."

[12] The "subpoena investigation" was initiated in response to an August 16, 2002, letter of complaint from Assistant Attorney General Michael Brown (Defs.' Mot. Summ. J., Ex. S). Stanley, or some other DOC official, had previously asked Brown whether he had authorized a subpoena Blackden issued in the Dematteo

7

hostile, by means of repeated investigations and exaggerated charges, that he had no reasonable choice but to resign.

Blackden was the subject of one other DOC investigation, the initiation of which he concedes to have been warranted. That investigation was prompted by: (1) a September 27, 2001, confrontation with his step-daughter's boyfriend, which led to his arrest; and (2) an investigation by the Belknap County Sheriff's Department into allegations that he had sexually abused his step-daughter.[13]

As a result of the September 27 incident and the Belknap County investigation, Blackden was suspended with pay, effective October 3, 2001. He filed a grievance challenging the suspension. On October 11, as a result of the patch and blue-

_____

investigation. (Stanley Dep. at 80, 84.) Brown had not, and filed a formal complaint. That investigation, which was concluded after plaintiff resigned, culminated in a report dated November 12, 2002 (Defs.' Mot. Summ. J., Ex. T), that included a finding that "[t]he preparation and issuing of the subpoena did not follow the procedures established by Investigations for the Department."

[13] While plaintiff concedes that an investigation of the September 27 incident was warranted, he also argues that "defendants made retaliatory use of that investigation." However, he does not explain what he means by "retaliatory use."

light incidents, Blackden was demoted from the position of Internal Affairs Investigator to the position of Corrections Counselor/Case Manager. He appealed his demotion. After Blackden was arrested in connection with the September 27 incident, his suspension with pay was converted into suspension without pay.

On October 30, 2002, Blackden filed a petition for injunctive relief in the New Hampshire Superior Court, seeking to have his pay restored during his period of suspension.[14] While Blackden's state petition did not mention First Amendment retaliation, it included allegations that defendants retaliated against him, by initiating the patch and blue-light investigations, in violation of the New Hampshire Whistleblower's Protection Act. On December 19, 2001, Blackden entered into an agreement settling both the appeal of his demotion and the grievance related to his suspension. The terms of settlement included the following:

---

[14] As it turns out, many paragraphs of plaintiff's complaint in this case are close paraphrases of paragraphs in his state pleadings.

9

- The disciplinary letter of demotion will be withdrawn.
- The suspension without pay pending the outcome of the arrest of Mr. Blackden by the Strafford, NH Police Department will be vacated.
- Mr. Blackden will accept a voluntary demotion to Sergeant.
- Mr. Blackden agrees to assignment as Sergeant to a Department of Corrections facility which has a vacancy with preference for: 1) Concord, 2) Laconia, 3) Second Shift.
- Mr. Blackden agrees to complete a Field Officer Training Program as directed by the Warden of the facility where he will be assigned.
- Mr. Blackden agrees to file no appeals of any kind to either the demotion or the suspension without pay.
- Mr. Blackden further agrees to dismiss any and all lawsuits which he has filed regarding either of these grievances, specifically, he will cause Civil Action No. 01-E-0393 to be dismissed.
- Mr. Blackden further agrees to file no action against the State of New Hampshire, Department of Corrections, [its] employees or officers resulting from the above-referenced grievances.
- This document will be maintained in a separate correspondence file in the Bureau of Human Resources and not maintained in Mr. Blackden's personnel file.

(Defs.' Mot. Summ. J., Ex. N.)  On January 8, 2002, Blackden moved for a voluntary nonsuit with prejudice in his state court action.

10

**Discussion**

I.  The Section 1983 Claim

Defendants move for summary judgment on plaintiff's § 1983 First Amendment claim on grounds that they took no adverse employment action against him and that plaintiff has failed to identify a genuine issue of material fact regarding retaliatory motive, which is an essential element of a First Amendment retaliation claim.  Defendants further argue that: (1) any claims against Gerry and Stanley based upon actions they took before October 30, 2001, are barred by the res judicata doctrine; (2) any claims related to plaintiff's suspension and demotion are barred by the doctrine of release; (3) as a matter of law, the three investigations concluded after October 30, 2001 – the shank, slander, and subpoena investigations – cannot serve as the basis for a retaliation claim because plaintiff did not suffer any adverse employment consequences as a result of those investigations; (4) plaintiff alleged no facts that link either O'Brien or Coplan to any of the actions he claims to have been retaliatory.  Defendants also argue that the court should decline to exercise jurisdiction over plaintiff's state law claims and,

11

in the alternative, that they are entitled to judgment on the merits of those claims.

Plaintiff counters that: (1) defendants' conduct after making the settlement agreement, which constituted a breach of the implied covenant of good faith and fair dealing, creates a genuine issue of material fact that precludes granting summary judgment based upon the settlement agreement; (2) res judicata does not apply because the state court action was based upon a much narrower claim than this action, and because the resolution of that action was based upon the settlement agreement, which defendants subsequently breached; (3) under the standard applicable to First Amendment retaliation claims, defendants' actions were severe enough to qualify as "adverse employment actions;" and (4) the suspicious timing of defendants' actions is evidence of retaliatory motivation sufficient to prevent summary judgment.

A.   The Relevant Law

In order to prevail on his claim of retaliation for exercising First Amendment rights, plaintiff must prove that: (1)

12

he engaged in speech on a matter of public concern; (2) his interest in speaking and the public interest in hearing what he had to say outweigh any legitimate interest on the government's part in the efficient performance of its public function; and (3) the protected speech was a motivating factor, or at least a substantial factor, in an adverse employment action against him. See Nethersole v. Bulger, 287 F.3d 15, 18 (1st Cir. 2002) (citations omitted).

However, even if plaintiff establishes all three elements of a First Amendment retaliation claim, defendants may still prevail by "demonstrat[ing], by a preponderance of the evidence, that the adverse employment action would have obtained regardless of the protected conduct engaged in by the plaintiff." Id. at 19 (citing Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Among other things, "[t]he 'Mt. Healthy defense' ensures that a plaintiff-employee who would have been dismissed in any event on legitimate grounds is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action." Guilloty Perez v. Pierluisi, 339 F.3d 43, 59 (1st Cir.

13

2003) (quoting <u>Acevedo-Diaz v. Aponte</u>, 1 F.3d 62, 66 (1st Cir. 1993)).

In their motion for summary judgment, defendants do not contest the first two elements of plaintiff's claim, and do not mount a <u>Mt. Healthy</u> defense.[15]  Rather, they argue only that plaintiff has failed, in two ways, to create a triable issue on the third element.  Specifically, defendants argue that they took no adverse employment action against plaintiff and that even if they had, plaintiff has failed to produce adequate evidence of a retaliatory motive.

B.  <u>The Effect of 2001 Settlement Agreement</u>

The first order of business is to determine which allegedly retaliatory actions by defendants are properly litigated in this case.  The key here is, of course, the December 2001 settlement agreement.  As noted, plaintiff argues that he is not bound by his agreement because defendants acted in bad faith after

_____

[15] Indeed, because defendants argue that they took no adverse employment action against plaintiff, the <u>Mt. Healthy</u> defense is, in their view, flatly inapplicable because they are not trying to "explain away" any adverse employment action as having been inevitable in light of factors other than plaintiff's protected conduct.

14

entering into the agreement.  Plaintiff's argument fails for two reasons.

First, the covenant of good faith and fair dealing implied in every New Hampshire contract was not breached because the 2001 settlement agreement did not "ostensibly allow to or confer upon the defendant[s] a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 144 (1989).  To the contrary, plaintiff received considerable value upon execution of the agreement: the disciplinary letter of demotion was removed from his file and the suspension without pay was vacated.[16]  Moreover, the discretion defendants exercised in initiating the slander and subpoena investigations was not discretion given them under the settlement agreement; that discretion was part of DOC's inherent authority as plaintiff's employer.  In sum, it does not appear that the implied covenant of good faith and fair dealing, as described in Centronics, provides plaintiff with any basis for avoiding his

_____

[16] Having his pay restored counts as substantial value because, as plaintiff concedes, that relief was the sole objective of his suit in state court.  (Pl.'s Obj. to Summ. J. ¶ 11.)

15

obligation under the agreement not to bring suit over DOC's response to the patch and blue-light incidents. (And plaintiff nowhere suggests that he has tendered return of the consideration he obtained under the agreement as a precondition to seeking recision.)

Second, even if Centronics did offer some support for plaintiff's effort to avoid the settlement agreement, defendants' decisions to initiate the slander and subpoena investigations do not amount to bad faith. Both investigations were begun in response to specific inquiries from reliable third parties, the New Hampshire State Police and the Attorney General's office. That the subpoena investigation was begun more than a year after the subpoena in question was issued does not demonstrate defendants' bad faith, because, by plaintiff's own admission, it was initiated no more than two weeks after defendants received a letter from Assistant Attorney General Brown complaining about the subpoena's issuance. The fact that Brown's letter was prompted by an inquiry from DOC is similarly unavailing to plaintiff. In the summer of 2002, DOC's attention was drawn to the Dematteo file, which included the fifteen-month-old subpoena,

16

by the slander accusation which was directly precipitated by Blackden's own actions, i.e., counseling Pauline Smith (a Dematteo victim) to contact Michael Kelley, who contacted Trooper Nolan, who reported the alleged slander to Captain Wiggin, who wrote the letter of complaint to DOC. (See Defs.' Mot. Summ. J., Ex. Q.) In short, the undisputed factual record can support no reasonable inference that any defendant investigated the Dematteo subpoena in bad faith.

Because plaintiff remains bound by the 2001 settlement agreement not to bring suit against DOC based upon the grievances he had filed to that point, and because those matters have already been fully litigated and resolved (barring further suit under principles of res judicata), the only DOC actions that may be litigated here are those that took place after settlement, i.e., DOC's decisions to investigate the slander and subpoena matters and the alleged constructive discharge.[17]

---

[17] Plaintiff has also alleged that shortly after the settlement agreement was reached, defendants began treating him poorly by isolating him, ignoring him, and assigning him to make-work tasks. That allegation, however, it too vague and conclusory to survive summary judgment.

C.    Defendants Took No Adverse Employment Actions

The next order of business is to determine which of defendants' actions qualify as "adverse employment actions." Defendants argue that plaintiff suffered no adverse employment action because none of the three investigations that were concluded after the settlement agreement resulted in any disciplinary action against him.  Plaintiff counters that the charges against him were groundless and that merely being subjected to investigation constituted an adverse employment action.  He also argues that the groundless investigations contributed substantially to his constructive discharge. According to plaintiff, because the severity standard for adverse employment actions in First Amendment retaliation cases is lower than that applied in Title VII suits, "[t]he actions by defendants all qualify, either alone or in aggregation, as adverse employment actions."  (Pl.'s Obj. to Summ. J. ¶ 19.)

In Blackie v. State of Maine, 75 F.3d 716 (1st Cir. 1996), the court of appeals set out the general principles to be applied

in determining whether an employer's act qualifies as an adverse employment action for purposes of a retaliation case.[18]

> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting [him], reducing [his] salary, or divesting [him] of significant responsibilities, see Crady v. Liberty Nat. Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993); Connell [v. Bank of Boston], 924 F.2d [1169,] 1179 [(1st Cir. 1991)], or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [him] for promotion after a particular period of service, see, e.g., Hishon v. King & Spalding, 467 U.S. 69, 75-76 (1984).

Blackie, 75 F.3d at 725-26 (parallel citations omitted). Determining whether an employee has suffered a material adverse employment action "necessarily requires a case-by-case inquiry." Id. at 725 (citing Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994); 2 Lex K. Larson, Employment Discrimination, § 34.04 (2d ed. 1994)).

---

[18] While Blackie was a retaliation case brought under the Fair Labor Standards Act, that opinion sets out the standards applicable to retaliation claims in general. 75 F.3d at 725. Moreover, the court of appeals has held that "[t]he fundamental meaning of 'adverse employment action' should remain constant regardless of the particular enabling statute." Larou v. Ridlon, 98 F.3d 659, 662 n.6 (1st Cir. 1996). Thus, there is no merit to plaintiff's argument that a diminished standard applies to First Amendment retaliation claims, and, in any event, all three of the cases plaintiff cites as illustrations of the "diminished standard" actually meet the test set out in Blackie.

In this case, plaintiff was not subjected to any adverse employment action. It is uncontested that none of the three investigations that were concluded after plaintiff agreed to settle his demotion and suspension grievances led to any reduction in salary, benefits, or status. Moreover, the two investigations that began after the settlement agreement, the slander and subpoena investigations, were initiated in direct response to charges made by the New Hampshire State Police and the Attorney General's Office, respectively. Because plaintiff has produced no evidence to suggest that defendants would not have investigated other employees under similar circumstances, his argument that he should not have been investigated amounts to a claim that he should have been given special dispensation as a result of having exercised his First Amendment rights, which claim runs directly counter to the Supreme Court's direction in Mt. Healthy. 429 U.S. at 286 (explaining that an employee's exercise of First Amendment rights should not prevent his employer from taking actions in the normal course). Thus, none of the three post-settlement investigations, standing alone, was a material adverse employment action.

Plaintiff fares no better when those three investigations are considered collectively. As noted above, plaintiff's vague and conclusory allegations that he was isolated, ignored, and given make-work tasks are insufficiently specific to create triable issues of fact adequate to defeat defendants' motion for summary judgment. Accordingly, the only possible adverse employment action plaintiff can claim is a constructive discharge based upon the results of the shank investigation, the slander investigation, and the initiation of the subpoena investigation.

"The phrase 'constructive discharge' usually describes harassment so severe and oppressive that staying on the job while seeking redress – the rule save in exceptional cases – is 'intolerable.'" Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 33 (1st Cir. 2003) (quoting Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 9-10 (1st Cir. 2001)). Defendants' initiation of the slander and subpoena investigations did not constitute severe and oppressive harassment that prevented plaintiff from staying on the job while seeking redress. Both investigations were undertaken in response to specific complaints from outside DOC, made by law enforcement agencies of the State of New Hampshire.

While plaintiff asserts that neither investigation was warranted, and takes issue with the adverse conclusion of the subpoena investigation, there are no facts in the record from which a reasonable jury could determine that defendants improperly "ginned up" the complaints that spurred the two investigations,[19] and there is no legal or factual basis for contending that it was improper for defendants to respond to the complaints they received in the way that they did, i.e., by initiating the slander and subpoena investigations. Because DOC responded in an objectively reasonable manner to the complaints it received, no reasonable person in plaintiff's position would have felt that defendants' actions made his working conditions so intolerable that he had to resign. Thus, Blackden was not constructively discharged and, as a consequence, suffered no adverse employment action.

_____

[19] As noted above, Assistant Attorney General Brown's letter of complaint, which prompted the subpoena investigation, was preceded by an inquiry directed to him from DOC officials. But, as also noted, DOC's renewed interest in the Dematteo investigation did not come out of the blue; it resulted from a chain events that began with Blackden's own informal counseling of Pauline Smith.

D.    Defendants Had No Retaliatory Motive

Even if defendants' decisions to initiate the slander and subpoena investigations did somehow qualify as adverse employment actions or created a workplace that rendered Blackden's resignation a constructive discharge, plaintiff has not created a triable issue of fact on the question of defendant's retaliatory motivation in taking those actions.  The "question of motivation, though usually one for the factfinder, can be resolved by the court on a summary judgment or Rule 50 motion if the plaintiff's evidentiary showing is insufficient."  Guilloty Perez, 339 F.3d at 56 (citing Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 12-13 (1st Cir. 2003); Lewis v. City of Boston, 321 F.3d 207, 220 (1st Cir. 2003)).  Plaintiff bears the burden of proving that "protected conduct was a motivating factor in the adverse employment action."  Guilloty Perez, 339 F.3d at 56.  That burden of proof may be met by circumstantial evidence.  See id. at 55-56.  Often, circumstantial evidence of retaliatory motivation takes the form of "close temporal proximity" between an employee's protected conduct and his employer's adverse employment action.  Nethersole, 287 F.3d at 20 (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)).

23

However, while close temporal proximity "may give rise to an inference of causal connection . . . that inference is not necessarily conclusive where . . . the inference is considerably weakened by other facts in the record." Lewis, 321 F.3d at 219 (citations and internal quotation marks omitted).

Here, there is no close temporal proximity between any of plaintiff's protected conduct and the initiation of either the slander or subpoena investigations.[20] According to plaintiff, the slander investigation was initiated in June 2002. In June 2002, plaintiff's most recent protected conduct was his October 24, 2001, testimony before the House Criminal Justice Committee. The subpoena investigation was begun, according to plaintiff, on September 4, 2002. At that time, the most recent protected conduct of which defendants were aware was his October 24, 2001,

---

[20] Plaintiff devotes several paragraphs of his objection to summary judgment to establishing the close temporal proximity between: (1) his confrontation and correspondence with Coplan and the initiation of the patch and blue-light investigations; and (2) his testimony before the House Criminal Justice Committee and his suspension, his demotion, and the initiation of the shank investigation. However, for the reasons given above, none of the foregoing employment actions are at issue here.

24

legislative testimony.[21]  Because the slander and subpoena

investigations were initiated eight and ten months after

plaintiff's last protected conduct that was known to defendants,

plaintiff has not established close temporal proximity between

protected conduct and any adverse employment action.  Because an

alleged temporal proximity is the only evidence plaintiff relies

on to establish retaliatory motivation for the slander and

subpoena investigations, and because no reasonable jury could

conclude that the timing of those investigative decisions gives

rise to an inference of a causal connection between plaintiff's

testimony and the decisions to investigate the slander and

subpoena accusations, plaintiff has failed, as a matter of law,

to establish the essential element of retaliatory motive.


    E.    The Mt. Healthy Defense

    Furthermore, even if plaintiff were able to establish

retaliatory motivation, the undisputed factual record supports a

---

[21] Plaintiff has produced no evidence that any defendant
knew of either his August 25 taped interview or his informal
legislative testimony, prior to the start of the subpoena
investigation.  Thus, plaintiff's expressive conduct in 2002
could not be found by a reasonable fact-finder to have motivated
defendants' decision to initiate the subpoena investigation.

25

complete <u>Mt. Healthy</u> defense.[22] The facts are clear - defendants initiated the blue-light investigation in response to a specific complaint from the Town of Loudon's Police Chief, and a reasonable jury could not find that they would not have done so absent the protected conduct engaged in by plaintiff. Similarly defendants initiated the slander and subpoena investigations based upon specific complaints from outside DOC, and would have done so regardless of the protected conduct engaged in by Blackden. It is difficult to imagine how defendants could have avoided conducting the slander and subpoena investigations, given the specific complaints they had received from the New Hampshire State Police and the Attorney General's Office. To conclude, if plaintiff were able to establish retaliatory motivation, which on this record he cannot, defendants would still be entitled, on the undisputed factual record, to a <u>Mt. Healthy</u> defense. They have produced evidence that would compel a reasonable jury to conclude by a preponderance that defendants would have investigated the blue-light, slander and subpoena matters even without a retaliatory motive. Plaintiff has presented no evidence

---

[22] As noted above, defendants themselves do not mount a <u>Mt. Healthy</u> defense because they do not concede that they took any material adverse employment action against Blackden.

26

undermining that complete defense, or putting any material issue of fact in dispute.

Because plaintiff has failed to produce evidence from which a reasonable jury could conclude that he was subjected to an adverse employment action, or that defendants acted with retaliatory motivation, and because defendants have established undisputed facts demonstrating that they would have initiated the slander and subpoena investigations independent of any retaliatory motivation, defendants are entitled to judgment as a matter of law on plaintiff's § 1983 First Amendment retaliation claim. Accordingly, their motion for summary judgment is granted with respect to Count I.

## II. The State Claims

Count I is plaintiff's only federal claim. Under the rule stated in Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998), the court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims, which are dismissed without prejudice.

## Conclusion

For the reasons given, defendants' motion for summary judgment (document no. 8) is granted in full.  The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 31, 2003

cc:  Michael K. Brown, Esq.
     Michael J. Sheehan, Esq.