THE KORMAN COMPANY, Agent for
Hyman Korman, Inc., Appellant,

v.

CUMBERLAND FARMS, INC., Appellee.

No. 97–2180.

United States Court of Appeals,
First Circuit.

Heard Feb. 5, 1998

Decided April 6, 1998.

Michael H. Landis with whom Smolow & Landis and Bertin C. Emmons were on brief for appellant.

Barbara D. Gilmore with whom Kathleen Provost, Sullivan & Worcester LLP, and Mark G. Howard were on brief for appellee.

Before SELYA, BOUDIN and LYNCH, Circuit Judges.

BOUDIN, Circuit Judge.

The parties to this case sought to settle a dispute between them, but the settlement agreement they reached has now given rise to a new dispute. Our own reading of the settlement agreement falls somewhere between the conflicting positions of the parties, but it is impossible to state the issue without some background and a description of the

pertinent terms of the agreement. Most, although not all, of the facts are undisputed.

The appellant, the Korman Company, leased a parcel of land to Chevron U.S.A., Inc., in Bensalem, Bucks County, Pennsylvania. Cumberland Farms, Inc., acquired the lease from Chevron in 1986 and used it to operate a gas station and convenience store. In 1992, Cumberland filed for bankruptcy in Massachusetts under Chapter 11.

The following year, Korman filed an adversary proceeding in the bankruptcy court, *see* Fed. R. Bankr.P. 7001, to eject Cumberland from the property, alleging that Cumberland had violated a provision of the lease. Cumberland then closed the gas station and reached a settlement with Korman, which the bankruptcy court approved. The dispute now before us arises out of the implementation of this settlement agreement.

In the settlement agreement, Korman agreed to buy out the remainder of Cumberland's lease for $90,000, provided that Cumberland cleared the property of all structures and eliminated any unlawful contamination of the soil and groundwater. Anxious to regain the property swiftly, Korman agreed to pay $90,000 into an escrow account with the understanding that 75 percent of the account's value would be released to Cumberland when it completed certain specified tasks. If Cumberland failed to complete these tasks by December 31, 1994, the escrow account would be reduced by $10,000 for each month of delay, so the 75 percent payment—due when the specified tasks were completed—would be a declining amount. The remaining 25 percent of the escrow account is to be paid only when Cumberland's "closure report" is approved by the Pennsylvania Department of Environmental Resources ("DER") at the conclusion of the cleanup.[1]

On February 7, 1995, Cumberland informed Korman that it would satisfy the requirements specified for release of 75 per-cent of the escrow account by February 8, 1995. This occurred somewhat more than a month after the December 31, 1994, deadline so the total amount of the escrow was already reduced by somewhat more than $10,-000. However, Korman refused to agree that any payment was due to Cumberland from the escrow, and Cumberland then filed a motion in the bankruptcy court to compel performance under the settlement agreement.

Paragraphs 2 and 4(a) of the agreement outline various tasks that Cumberland must perform to be entitled to the 75 percent payment. Korman admits that a number of the requirements were satisfied (*e.g.*, removal of underground storage tanks and demolition of buildings). But Korman denies that Cumberland has satisfied requirements in paragraph 4(a)(iii) and (iv) relating to removal of contaminated soil, remediation of contaminated groundwater and installation of equipment required for long-term remediation. Paragraph 4(a) describes Cumberland's pertinent obligations as follows:

> iii) removal and replacement of contaminated soil, if any, and the commencement of remediation of any contaminated groundwater to the extent such removal and/or remediation is deemed necessary by the appropriate federal or state authorities;

> iv) to the extent deemed necessary by the appropriate federal or state authorities, installation of any equipment and/or systems required for a long-term remediation system; and

> v) delivery to Korman of written certification by a reputable licensed environmental consulting engineer that the work required in Paragraphs 2(a) through 2(d) and Paragraph 4(a)(i)-(iv) hereof has been completed.

---

1. Pennsylvania's environmental regulations require owners and operators of underground storage tanks to maintain a report of the closure of a tank and submit it to DER, *if* requested. 25 Pa.Code § 245.452(f) (1997). During closure, owners and operators must investigate whether a "reportable release" of contaminants into the environment has occurred and, if it has, under-take remedial action. *Id.* This involves notice to various entities, interim remedial action, and tests on the property with results reported to DER. *Id.* §§ 245.305–245.310. In addition, the owner or operator must submit a "remedial action plan" and receive DER approval prior to commencing remediation pursuant to that plan. *See id.* § 245.311.

In the bankruptcy court, Cumberland argued that, without any direction from any federal or state agency, it had removed approximately 440 tons of contaminated soil and had installed underground piping that would enable future remediation if required. To show that it had satisfied the requirements of subparagraphs (iii) and (iv), Cumberland relied upon a letter from a firm of licensed geologists and engineers purporting to certify that Cumberland had satisfied all the requirements of paragraphs 2 and 4 of the agreement, a certification previously furnished to Korman. Cumberland also provided a letter from DER acknowledging that Cumberland had filed a closure report.

In response, Korman urged that subparagraphs (iii) and (iv) required Cumberland to follow procedures set out in DER's environmental regulations, and it offered an affidavit of a consulting engineer, experienced in environmental projects, stating that Cumberland was required to receive DER approval prior to commencing remediation, and that filing a closure report did not amount to such approval. The same affidavit asserted that contaminants in excess of DER's cleanup standards were still present in the soil on the property.

The bankruptcy court held a telephone hearing on June 28, 1995, and issued an order on November 29, 1995, directing that 75 percent of the escrow account (as reduced by the delay penalty) be paid to Cumberland. The court reasoned that government approvals were required only for the second stage's 25 percent payment and that Cumberland had satisfied its obligations at the first stage by providing the written certification of its retained engineer as provided in subparagraph (v) that all work required under paragraphs 2 and 4 had been completed. The district court affirmed the order summarily, and Korman now appeals to us.

Interpretation of the settlement agreement presents a legal issue which we resolve de novo. See Blackie v. State of Me., 75 F.3d 716, 721 (1st Cir.1996). Neither side suggests that there is any extrinsic evidence bearing on the meaning of the agreement, so inquiry is limited to the language and context of the agreement in an effort to ascertain what reasonable parties would have understood by the use of that language under the circumstances. See E.A. Farnsworth, Contracts § 5.9, at 510–11 (2d ed.1990).

Korman's central position is that the agreement required Cumberland, in complying with the removal, replacement, commencement of remediation and installation requirements of subparagraphs (iii) and (iv), to obtain prior governmental approval of Cumberland's remedial actions under the procedures promulgated by the Pennsylvania DER. Korman points specifically to the phrase "to the extent deemed necessary by the appropriate federal or state authorities," which appears in subparagraphs (iii) and (iv). We do not think that this is a sustainable reading.

The most straightforward reading of the quoted phrase, in the context in the two paragraphs, is that removal, replacement, commencement of remediation and installation must meet the substantive requirements or standards set by the government. While in some contexts this might also imply—although not expressly state—that Cumberland must obtain clearances from the authorities before the money is due, there is both a textual and a practical reason for rejecting that inference in this case. The textual reason is the lack of an explicit requirement, coupled with the presence of a related provision in the agreement—paragraph 8—expressly requiring governmental approval, but only as a condition for the second 25 percent payment.

On the practical side, we agree with the bankruptcy court that Cumberland would not here have agreed to terms whereby Cumberland would be penalized for a government agency's delay in approving a remedial action plan. The parties entered into the settlement agreement only on December 13, 1994. Even assuming that Cumberland was immediately prepared to file a remedial action plan, Korman's reading assumes that Cumberland was willing to begin forfeiting funds at the rate of $10,000 a month if DER required more than 18 days to approve the plan.

Korman argues that prior governmental approval of a remedial action plan was an essential part of its bargain, because it wanted to warrant to any new tenant that DER would not require further cleanup actions. But if agency approval were a precondition of the first-stage 75 percent payment, it could easily have been expressed in those terms, as it was in paragraph 8 requiring DER's approval of the closure report. The difference is that the approval required in paragraph 8 is a criterion of the second stage payment of 25 percent and cannot be demanded prematurely.

Rejecting Korman's reading of the agreement does not lead us to embrace Cumberland's. Cumberland says that subparagraphs (iii) and (iv) do not require any cleanup because no federal or state agency has come forward to say that the agency "deemed" such action necessary. But what cleanup is "deemed necessary by the appropriate ... authorities" can be discerned from their regulations and standards. And, on a practical level, we think it unlikely that Korman would have agreed that no cleanup was required merely because the government had not gotten around to demanding it by the payment date.

In sum, the agreement is a compromise, falling between the parties' extreme positions. To secure the 75 percent, Cumberland had to perform the necessary tasks to whatever substantive level is required under the law, even if no explicit order to Cumberland had issued from a government agency. Only for the remaining 25 percent did Cumberland have to obtain the final seal of approval of DER. Whether the drafters fully understood the Pennsylvania cleanup process is another matter.

■ This brings us to the question whether Cumberland has met the substantive requirements of subparagraphs (iii) and (iv). At oral argument, Cumberland urged that the parties had committed this determination to the final judgment of the "licensed environmental consulting engineer" referred to in subparagraph (v).[2] This might be an efficient solution for parties to such an agree-

ment, but Cumberland's reading does not square with the settlement agreement.

The straightforward language of paragraph 4(a) requires Cumberland actually to perform the removal, replacement, commencement and installation as specified in subparagraphs (iii) and (iv) and then, as specified separately in subparagraph (v), to deliver the written certification. Nothing in subparagraph (v) suggests that the written certification is conclusive. So far as the language goes, Korman was free to accept the written certification as adequate, presumably reserving its right (if any) to sue the engineer later, or to dispute now that subparagraph (iii) and (iv) had in fact been satisfied.

■ In the bankruptcy court, Korman's supporting affidavit averred that volatile organic compounds on the property remain "at levels in excess of DER's cleanup standards." Cumberland's certification asserts only that 440 tons of soil were evacuated and removed and that soil vapor extraction lines were installed. But if this implies a view that all regulations have been satisfied, whether Cumberland in fact satisfied Pennsylvania requirements was not decided by the bankruptcy court and can hardly be decided by us in the face of conflicting assertions by experts.

It follows that the matter must be remanded to the bankruptcy court to determine whether Cumberland's removal, replacement, commencement of remediation and installation do meet the substantive requirements of "the appropriate federal or state authorities." This might turn out to be a technical factual issue about the extent of soil removal or something far more complicated. Given the limited dollar amount involved, the parties would be well-advised to consider a settlement.

The judgment of the district court affirming the order of the bankruptcy court is *vacated* and the matter is *remanded* for further proceedings consistent with this opinion.

---

2. The parties later discovered that Pennsylvania does not recognize "licensed environmental con-

sulting engineers," and Cumberland's letter was from a firm of licensed geologists and engineers.

Each side shall bear its own costs on this appeal.

*It is so ordered.*