USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2180

 THE KORMAN COMPANY, AGENT FOR HYMAN KORMAN, INC.,

 Appellant,

 v.

 CUMBERLAND FARMS, INC.,

 Appellee.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nathaniel M. Gorton, U.S. District Judge]

 ____________________

 Before

 Selya, Boudin and Lynch,

 Circuit Judges.

 ____________________

 Michael H. Landis with whom Smolow & Landis and Bertin C.
Emmons were on brief for appellant.
 Barbara D. Gilmore with whom Kathleen Provost, Sullivan &
Worcester LLP, and Mark G. Howard were on brief for appellee.

 
 
 April 6, 1998
 
 
 
 BOUDIN, Circuit Judge. The parties to this case sought
to settle a dispute between them, but the settlement agreement they
reached has now given rise to a new dispute. Our own reading of
the settlement agreement falls somewhere between the conflicting
positions of the parties, but it is impossible to state the issue
without some background and a description of the pertinent terms of
 the agreement. Most, although not all, of the facts are
 undisputed.
 The appellant, the Korman Company, leased a parcel of
 land to Chevron U.S.A., Inc., in Bensalem, Bucks County,
 Pennsylvania. Cumberland Farms, Inc., acquired the lease from
 Chevron in 1986 and used it to operate a gas station and
convenience store. In 1992, Cumberland filed for bankruptcy in
 Massachusetts under Chapter 11.
 The following year, Korman filed an adversary proceeding
 in the bankruptcy court, see Fed. R. Bankr. P. 7001, to eject
Cumberland from the property, alleging that Cumberland had violated
a provision of the lease. Cumberland then closed the gas station
and reached a settlement with Korman, which the bankruptcy court
 approved. The dispute now before us arises out of the
 implementation of this settlement agreement.
 In the settlement agreement, Korman agreed to buy out the
 remainder of Cumberland's lease for $90,000, provided that
Cumberland cleared the property of all structures and eliminated
any unlawful contamination of the soil and groundwater. Anxious to
regain the property swiftly, Korman agreed to pay $90,000 into an
 escrow account with the understanding that 75 percent of the
account's value would be released to Cumberland when it completed
certain specified tasks. If Cumberland failed to complete these
tasks by December 31, 1994, the escrow account would be reduced by
$10,000 for each month of delay, so the 75 percent payment--due
 when the specified tasks were completed--would be a declining
amount. The remaining 25 percent of the escrow account is to be
paid only when Cumberland's "closure report" is approved by the
Pennsylvania Department of Environmental Resources ("DER") at the
conclusion of the cleanup.
 On February 7, 1995, Cumberland informed Korman that it
would satisfy the requirements specified for release of 75 percent
of the escrow account by February 8, 1995. This occurred somewhat
more than a month after the December 31, 1994, deadline so the
total amount of the escrow was already reduced by somewhat more
than $10,000. However, Korman refused to agree that any payment
was due to Cumberland from the escrow, and Cumberland then filed a
motion in the bankruptcy court to compel performance under the
settlement agreement.
 Paragraphs 2 and 4(a) of the agreement outline various
tasks that Cumberland must perform to be entitled to the 75 percent
payment. Korman admits that a number of the requirements were
satisfied (e.g., removal of underground storage tanks and
demolition of buildings). But Korman denies that Cumberland has
satisfied requirements in paragraph 4(a)(iii) and (iv) relating to
removal of contaminated soil, remediation of contaminated
groundwater and installation of equipment required for long-term
remediation. Paragraph 4(a) describes Cumberland's pertinent
obligations as follows:
 iii) removal and replacement of
 contaminated soil, if any, and the
 commencement of remediation of any
 contaminated groundwater to the extent such
 removal and/or remediation is deemed necessary
 by the appropriate federal or state
 authorities;
 iv) to the extent deemed necessary by
 the appropriate federal or state authorities,
 installation of any equipment and/or systems
 required for a long-term remediation system;
 and
 v) delivery to Korman of written
 certification by a reputable licensed
 environmental consulting engineer that the
 work required in Paragraphs 2(a) through 2(d)
 and Paragraph 4(a)(i)-(iv) hereof has been
 completed.

 In the bankruptcy court, Cumberland argued that, without
any direction from any federal or state agency, it had removed
approximately 440 tons of contaminated soil and had installed
underground piping that would enable future remediation if
required. To show that it had satisfied the requirements of
subparagraphs (iii) and (iv), Cumberland relied upon a letter from 
a firm of licensed geologists and engineers purporting to certify
that Cumberland had satisfied all the requirements of paragraphs 2
and 4 of the agreement, a certification previously furnished to
Korman. Cumberland also provided a letter from DER acknowledging
that Cumberland had filed a closure report.
 In response, Korman urged that subparagraphs (iii) and
(iv) required Cumberland to follow procedures set out in DER's
environmental regulations, and it offered an affidavit of a
consulting engineer, experienced in environmental projects, stating
that Cumberland was required to receive DER approval prior to
commencing remediation, and that filing a closure report did not
amount to such approval. The same affidavit asserted that
contaminants in excess of DER's cleanup standards were still
present in the soil on the property.
 The bankruptcy court held a telephone hearing on June 28,
1995, and issued an order on November 29, 1995, directing that 75
percent of the escrow account (as reduced by the delay penalty) be
paid to Cumberland. The court reasoned that government approvals
were required only for the second stage's 25 percent payment and
that Cumberland had satisfied its obligations at the first stage by
providing the written certification of its retained engineer as
provided in subparagraph (v) that all work required under
paragraphs 2 and 4 had been completed. The district court affirmed
the order summarily, and Korman now appeals to us.
 Interpretation of the settlement agreement presents a
legal issue which we resolve de novo. See Blackie v. State of Me.,
75 F.3d 716, 721 (1st Cir. 1996). Neither side suggests that there
is any extrinsic evidence bearing on the meaning of the agreement,
so inquiry is limited to the language and context of the agreement
in an effort to ascertain what reasonable parties would have
understood by the use of that language under the circumstances. 
See E.A. Farnsworth, Contracts 5.9, at 510-11 (2d ed. 1990).
 Korman's central position is that the agreement required 
Cumberland, in complying with the removal, replacement,
commencement of remediation and installation requirements of
subparagraphs (iii) and (iv), to obtain prior governmental approval
of Cumberland's remedial actions under the procedures promulgated
by the Pennsylvania DER. Korman points specifically to the phrase
"to the extent deemed necessary by the appropriate federal or state
authorities," which appears in subparagraphs (iii) and (iv). We do
not think that this is a sustainable reading.
 The most straightforward reading of the quoted phrase, in 
the context in the two paragraphs, is that removal, replacement,
commencement of remediation and installation must meet the
substantive requirements or standards set by the government. While
in some contexts this might also imply--although not expressly
state--that Cumberland must obtain clearances from the authorities
before the money is due, there is both a textual and a practical
reason for rejecting that inference in this case. The textual
reason is the lack of an explicit requirement, coupled with the
presence of a related provision in the agreement--paragraph 8--
expressly requiring governmental approval, but only as a condition
for the second 25 percent payment.
 On the practical side, we agree with the bankruptcy court
that Cumberland would not here have agreed to terms whereby
Cumberland would be penalized for a government agency's delay in
approving a remedial action plan. The parties entered into the
settlement agreement only on December 13, 1994. Even assuming that
Cumberland was immediately prepared to file a remedial action plan,
Korman's reading assumes that Cumberland was willing to begin
forfeiting funds at the rate of $10,000 a month if DER required
more than 18 days to approve the plan.
 Korman argues that prior governmental approval of a
remedial action plan was an essential part of its bargain, because
it wanted to warrant to any new tenant that DER would not require
further cleanup actions. But if agency approval were a
precondition of the first-stage 75 percent payment, it could easily
have been expressed in those terms, as it was in paragraph 8
requiring DER's approval of the closure report. The difference is
that the approval required in paragraph 8 is a criterion of the
second stage payment of 25 percent and cannot be demanded
prematurely.
 Rejecting Korman's reading of the agreement does not lead
us to embrace Cumberland's. Cumberland says that subparagraphs
(iii) and (iv) do not require any cleanup because no federal or
state agency has come forward to say that the agency "deemed" such
action necessary. But what cleanup is "deemed necessary by the
appropriate . . . authorities" can be discerned from their
regulations and standards. And, on a practical level, we think it
unlikely that Korman would have agreed that no cleanup was required
merely because the government had not gotten around to demanding it
by the payment date.
 In sum, the agreement is a compromise, falling between
the parties' extreme positions. To secure the 75 percent,
Cumberland had to perform the necessary tasks to whatever
substantive level is required under the law, even if no explicit
order to Cumberland had issued from a government agency. Only for
the remaining 25 percent did Cumberland have to obtain the final
seal of approval of DER. Whether the drafters fully understood the
Pennsylvania cleanup process is another matter.
 This brings us to the question whether Cumberland has met
the substantive requirements of subparagraphs (iii) and (iv). At
oral argument, Cumberland urged that the parties had committed this
determination to the final judgment of the "licensed environmental
consulting engineer" referred to in subparagraph (v). This might
be an efficient solution for parties to such an agreement, but
Cumberland's reading does not square with the settlement agreement.
 The straightforward language of paragraph 4(a) requires
Cumberland actually to perform the removal, replacement,
commencement and installation as specified in subparagraphs (iii)
and (iv) and then, as specified separately in subparagraph (v), to
deliver the written certification. Nothing in subparagraph (v)
suggests that the written certification is conclusive. So far as
the language goes, Korman was free to accept the written
certification as adequate, presumably reserving its right (if any)
to sue the engineer later, or to dispute now that subparagraph
(iii) and (iv) had in fact been satisfied.
 In the bankruptcy court, Korman's supporting affidavit
averred that volatile organic compounds on the property remain "at
levels in excess of DER's cleanup standards." Cumberland's
certification asserts only that 440 tons of soil were evacuated and
removed and that soil vapor extraction lines were installed. But
if this implies a view that all regulations have been satisfied,
whether Cumberland in fact satisfied Pennsylvania requirements was
not decided by the bankruptcy court and can hardly be decided by us
in the face of conflicting assertions by experts.
 It follows that the matter must be remanded to the
bankruptcy court to determine whether Cumberland's removal,
replacement, commencement of remediation and installation do meet
the substantive requirements of "the appropriate federal or state
authorities." This might turn out to be a technical factual issue
about the extent of soil removal or something far more complicated. 
Given the limited dollar amount involved, the parties would be
well-advised to consider a settlement.
 The judgment of the district court affirming the order of
the bankruptcy court is vacated and the matter is remanded for
further proceedings consistent with this opinion. Each side shall
bear its own costs on this appeal.
 It is so ordered.