**Amy BERRY, Plaintiff,**

v.

**CITY OF SOUTH PORTLAND, MAINE, Defendant.**

**No. 06–CV–233–P–S.**

United States District Court, D. Maine.

Nov. 19, 2007.

J. Joseph McKittrick, McKittrick Law Offices, N. Hampton, NH, for Plaintiff.

Melissa A. Hewey, Peter C. Felmly, Drummond, Woodsum & MacMahon, Portland, ME, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

GEORGE Z. SINGAL, Chief Judge.

Before the Court is Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law. (Docket # 17.) Through this Motion, Defendant the City of South Portland, Maine seeks summary judgment on all counts alleged by Plaintiff Amy Berry arising out of her employment at the South Portland Police Department. After reviewing the parties' submissions, the Court GRANTS the Motion for the reasons explained below.

## I. BACKGROUND

### A. General Background

Defendant City of South Portland ("City") is a municipal entity. (Defendant's Statement of Material Facts ("Defendant's SMF") (Docket # 18) ¶ 1.) The South Portland Police Department is a police force of approximately fifty employees. (*Id.* ¶ 2.) At all relevant times, the Police Department has been commanded by Police Chief Edward Googins ("Chief Googins") and the City Manager has been Jeffrey Jordan. (*Id.* ¶¶ 3, 5.)

### B. Plaintiff's Employment with the Police Department

Plaintiff Amy Berry ("Deputy Chief") is the current Deputy Chief of the Police Department and has held that position for approximately six years. (*Id.* ¶ 6.) Plaintiff started with the South Portland Police Department as an officer in 1977. (*Id.* ¶ 7.) She became the first female Sergeant in the State of Maine in 1984. (*Id.* ¶ 8.) During her first year as Sergeant, she was made an acting Lieutenant and was assigned to the duty of shift commander. (Defendant's SMF ¶ 8) Plaintiff was promoted to Lieutenant a year later, in October 1985.(*Id.*) She held the position of Lieutenant for approximately fifteen years, before being promoted to the rank of Deputy Chief in September of 2001. (*Id.* ¶ 10; Plaintiff's Statement of Material Facts ("Plaintiff's SMF") (Docket # 41) ¶ 6.)[1] Plaintiff was promoted to Deputy Chief

---

1. Plaintiff's Statement of Material Facts suffers from a number of deficiencies. First, ¶¶ 7, 10, 25, 28, 56, 63 and 64 of Plaintiff's Statement of Material Facts rely in whole or in part on documents that inexplicably are missing from the record in this case. After reviewing the entire docket, the Court was unable to locate the documents on which these statements rely. Thus, the statements of fact on which those documents rely have not been considered by the Court for summary judgment.

Second, Defendant alleges that numerous statements of material fact by Plaintiff (¶¶ 11, 29, 30, 21, 35, 38, 39, 44, 53, 54, 56, 62, 68, 69, 71, 72) should be stricken because the underlying documents have not been properly

after scoring the highest of the candidates through the interview and testing process. (Plaintiff's SMF ¶ 7; Defendant's Reply to Plaintiff's Statement of Material Fact (Docket # 48) ¶ 7.) The decision to promote Plaintiff to the rank of Deputy Chief was made by Jordan, with the advice and agreement of Chief Googins. (Defendant's SMF ¶ 12.) At the time of her promotion, Plaintiff was qualified for the position of Deputy Chief. (Plaintiff's SMF ¶ 6.) Plaintiff was selected to serve as Deputy Chief over two male officers, and she is the only person in the Police Department that holds the rank of Deputy Chief. (Defendant's SMF ¶ 13.) Deputy Chief Berry is the only female officer with a rank higher than Sergeant in the history of the South Portland Police Department. (Plaintiff's SMF ¶ 8.)

Prior to April 2005, Plaintiff was responsible for the day-to-day operations of the entire patrol and detective bureaus within the Police Department. (Defendant's SMF ¶ 15; Plaintiff's SMF ¶ 13.) She was responsible for oversight of command and investigations, dispatch, and the support and services division. (Defendant's SMF ¶ 15.) She supervised the three patrol Lieutenants and was responsible for oversight of Internal Investigations, which she conducted in a professional and correct manner.[2] (*Id.;* Plaintiff's SMF ¶ 15.) She also oversaw the Officer of the Month and Year Programs. (Defendant's SMF ¶ 15.) In addition, while Chief Googins made the final recommendations as to discipline, the Deputy Chief made recommendations to the Chief. (Plaintiff's SMF ¶ 18; Defendant's Reply to Plaintiff's SMF ¶ 18.) Although the Chief was in ultimate command of the Police Department, he did not have daily contact, information, or supervisory responsibility over the command staff within the Department. (Defendant's SMF ¶ 4; Plaintiff's SMF ¶ 13.) Plaintiff also has served as acting Chief in the absence of Chief Googins or when he was not available. (Defendant's SMF ¶ 14.)

## C. The Smith Complaint and the resulting investigation

On January 13, 2005, Sergeant David Smith, a patrol officer with the Police De-

---

authenticated as required by Federal Rule of Evidence 901. Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." With respect to each of the challenged documents, there is nothing on the summary judgment record to allow the Court to determine that "the matter in question is what its proponent claims." Fed.R.Evid. 901(a). For that reason, the Court did not include or consider those statements of material fact for the purpose of determining the present Motion.

Third, Local Rule 56 requires a party opposing summary judgment to admit, deny or qualify each fact and "shall support each denial or qualification by a record citation as required by this rule." Local Rule 56(c). Local Rule 56(f) requires that "[a]n assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific

page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.* at 56(f). In Plaintiff's Statement of Material Facts ¶¶ 12, 21 and 22, Plaintiff proffers an assertion followed by a citation to documents that are either forty-five or twenty-one pages. The citations contain not a single citation to a specific page or paragraph. In accord with Local Rule 56, the Court declines to wade through the exhibits to locate support for those assertions.

**2.** The Chief had wanted some changes made to Internal Investigations, and there had been some improvement. (Plaintiff's SMF ¶ 14.) In addition, the City had been complimented for the job that it was doing on Internal Investigations. (*Id.* ¶ 19.)

partment, filed a harassment complaint against Chief Googins and Deputy Chief Berry ("the Smith Complaint").[3] (*Id.* ¶ 16.) The Smith Complaint was submitted to the City's Director of Human Resources, Beth Drennen–Bates ("Drennen–Bates").[4] (*Id.* ¶ 20.) After reviewing the written complaint and the grievance in early January 2005, Drennen–Bates informed the Chief and Deputy Chief that the complaint and grievance had been filed and generally described what the allegations were.[5] (*Id.* ¶ 22.) Plaintiff learned that the Smith Complaint included allegations leveled against both her and the Chief. (*Id.* ¶ 24.) Drennen–Bates informed the Deputy Chief that the allegations included harassment, age discrimination and hostile work environment. (*Id.* ¶ 26.) At the time, Drennen–Bates did not bring a copy of the complaint with her and the Deputy Chief did not ask to see a copy of it. (Defendant's SMF ¶ 25; Plaintiff's Response to Defendant's Statement of Material Facts (Docket # 46) ¶ 25.) Chief Googins was not provided with a copy of the Smith Complaint either. (Defendant's SMF ¶ 27.) He was told, however, that the allegations had to do with harassment and hostile work environment. (*Id.*)

Drennen–Bates then spent more than one month interviewing fifty-five people in the City's Police Department. (*Id.* ¶ 28; Plaintiff's Response to Defendant's SMF ¶ 28.) In her investigation, Drennen–Bates was investigating a hostile work environment in the Police Department. (Defendant's SMF ¶ 29.) Drennen–Bates did not attempt to verify or substantiate comments made by individuals because her investigation was focused on gathering information about individuals' work place experiences and making recommendations about improvements, so verification had no role in the investigation. (Plaintiff's SMF ¶¶ 31, 32; Defendant's Reply to Plaintiff's SMF ¶¶ 31, 32.)

As a result of the investigation, it was apparent to Drennen–Bates that there was a morale issue within the Police Department. (Defendant's SMF ¶ 30.) Drennen–Bates discovered that a large percentage of the employees had one or more concerns with the working conditions within the Department. (*Id.*) Some members of the Police Department expressed concerns with both the Chief and the Deputy Chief. (*Id.* ¶ 31.) Many employees reported that morale was low and that they felt that their superiors, particularly Deputy Chief Berry, did not support them. (*Id.*

---

3. The Smith Complaint alleged that both the Chief and Deputy Chief: (1) had engaged in harassment, discrimination and created a hostile work environment; (2) had used different standards in their treatment of different employees; and (3) that there were issues with certain equipment used in the Department. (Defendant's SMF ¶ 16.) At approximately the same time, the South Portland Police Command and Supervisory Unit union filed a grievance on Sergeant Smith's behalf, which concerned the way an Internal Affairs investigation of Sergeant Smith was handled. (*Id.* ¶ 17.) The crux of that grievance was that the Deputy Chief conducted an investigation of Sergeant Smith without first informing him of the complaint. (*Id.* ¶ 18.) Prior to the union filing the grievance, Chief Googins advised the union that the administration found

no problem with the handling of the investigation. (*Id.* ¶ 19.)

4. Drennen–Bates had not previously been involved in any paramilitary organization investigation. (Plaintiff's SMF ¶ 30; Defendant's Reply to Plaintiff's SMF ¶ 30.) Neither Drennen–Bates nor Jordan had experience with, or knowledge of, the inner workings of a Police Department. (Plaintiff's SMF ¶ 42.) Drennen–Bates also handled the union grievance. (Defendant's SMF ¶ 20.)

5. The Deputy Chief was aware of the circumstances underlying the Smith Complaint and thus was not surprised to hear that Sergeant Smith had filed a complaint. (Defendant's SMF ¶ 23.)

¶ 35.) Specifically, several employees complained that they believed that the Deputy Chief was unapproachable, that she was unfriendly, that she favored particular employees, that she was nitpicking and that she would go out of her way to find fault. (*Id.* ¶ 36.) Examples included that she would look through the trash for evidence to "hang" them and that she eavesdropped on conversations. (*Id.*) Many of the complaints, however, involved unsubstantiated concerns or matters over which the Deputy Chief had no control. (Plaintiff's SMF ¶ 43.) Chief Googins admitted that, "[a] lot of the decisions being complained about were my own." (*Id.*)

The officers stated that they did not feel supported by the administration; they complained that: there seemed to be preferential treatment given to the Deputy Chief's husband, a police officer in the Department, due to their marital relationship; the Chief did not adequately address their concerns; there was irregular communication between employees and the administration;[6] there was irregular communication between the administration and the unions;[7] and there were ongoing safety and coverage issues with the department's radios. (Defendant's SMF ¶ 32.) The Internal Affairs ("IA") process was the subject of the largest number of concerns. (*Id.* ¶ 39.) Deputy Chief Berry was directly responsible for administration of the IA process. (*Id.* ¶ 40.) Relatedly, there were a number of employees who raised concerns about the fact that Deputy Chief Berry's husband, Sergeant George Berry, would from time to time work in the role of back-up investigator to the Chief IA Investigator.[8] (*Id.* ¶ 41.) This led to a feeling among employees that when the Deputy Chief reviewed the work of Sergeant Berry, the Deputy Chief would be unable to be unbiased or critical of Sergeant Berry's investigation and findings. (*Id.;* Plaintiff's Response to Defendant's SMF ¶ 42.) Nonetheless, Chief Googins knew that the Deputy Chief had no supervisory authority over her husband, except in the Chief's absence. (Plaintiff's SMF ¶ 70; Defendant's Reply to Plaintiff's SMF ¶ 70.) Drennen–Bates found out through the investigation that the Deputy Chief conducted one evaluation of her husband in 1994 and one in 2001 and none thereafter because the Chief was designated to do the evaluations of Sergeant Berry. (Plaintiff's SMF ¶ 71.)

In mid-February 2005, Drennen–Bates met with Deputy Chief Berry for two to three hours to share with her the complaints raised by the Department's employees as well as to hear her side of the story.[9] (Defendant's SMF ¶ 45.) In Drennen–Bates' interview with the Deputy Chief, Plaintiff acknowledged the complaints and explained her intentions behind her actions. (*Id.* ¶ 46.) During that meeting, Drennen–Bates permitted the Deputy Chief to give her side of the story relating

---

6. Employees complained that the Chief had stopped the regular meetings that historically had been held between administration and the command staff. (Defendant's SMF ¶ 34.)

7. The unions were dissatisfied that the Chief had stopped holding executive board meetings with union leadership, which provided an opportunity for the union to share their concerns with the Chief. (Defendant's SMF ¶ 33.)

8. In addition, at an earlier point in time, Chief Googins learned that the Deputy Chief's husband was receiving unauthorized overtime; after the Chief confronted him about it, the unauthorized overtime stopped. (Plaintiff's SMF ¶ 33; Defendant's Reply to Plaintiff's SMF ¶ 33.)

9. Plaintiff's denial is not supported by Plaintiff's Exhibit 4, while the other citation does not reference a specific page number. *See supra* note 1.

to the conflict of interest charges (i.e. allegations concerning inappropriate handling of internal investigations), the allegation that she was rifling through the trash of her subordinates to get them in trouble, and the allegation that she was listening in on the conversations and reviewing e-mails of her subordinates on their laptops. (*Id.* ¶¶ 47, 50, 51, 52.) The Deputy Chief also was made aware of the fact that some employees were jealous of Sergeant George Berry's position in the organization. (*Id.* ¶ 48.)

Drennen–Bates engaged in the same process with Chief Googins. (*Id.* ¶ 55.) Drennen–Bates provided the Chief with information concerning her investigation generally, as well as the result of the investigation, and offered him an opportunity to respond with his side of the story. (*Id.*)

## D. Meetings to discuss employees' complaints

On March 2, 2005, Drennen–Bates and Jordan met with Chief Googins to review the results of Drennen–Bates' investigation, to begin discussions on how to improve morale within the Police Department and to respond to the concerns raised by the employees during the investigation. (Defendant's SMF ¶ 56.) Chief Googins acknowledged that there were indeed problems within the Department and offered to try and formulate a series of changes and revisions to Department structure and policies that would provide a solution to the problems. (*Id.* ¶ 58.) Among the suggestions he made were the following: equipment upgrades, reinstituting a previous practice of having regular monthly staff meetings and regular meetings with the Patrolman's Units, and revamping or restructuring the Department's Internal Affairs procedure. (*Id.*)

As planned, Drennen–Bates, Jordan and Chief Googins met again on March 3, 2005. (*Id.* ¶ 60.) During that meeting, they brainstormed ways to improve morale in the Department and to address the complaints that Drennen–Bates had heard frequently. (*Id.*) Some of the ideas that were generated during that meeting were to deal with the radio issue, to re-institute regular monthly meetings between the Chief and Patrol and Command unions, and to conduct monthly command staff meetings. (*Id.* ¶ 61.) Deputy Chief Berry was not invited to the initial or second meeting. (Plaintiff's SMF ¶ 44.)

On March 7, 2005, Jordan, Drennen–Bates and Chief Googins met with Deputy Chief Berry to fill her in on the process. (Defendant's SMF ¶ 62.) By this time, Drennen–Bates made the Chief and Jordan aware that both of the City's Police Unions planned to hold votes of no confidence against the Police Department. (*Id.* ¶ 63.) Jordan shared that votes of no confidence were scheduled against both the Chief and Deputy Chief. (*Id.* ¶¶ 63, 64.) A vote of no confidence is an embarrassment to those against whom it is taken and creates turmoil within the Department. (*Id.* ¶ 65.)

During the March 7 meeting, the Deputy Chief responded to and explained her version of the allegations concerning her "snooping" through the trash and monitoring laptop communications. (*Id.* ¶¶ 68, 59.) She explained that she objected to some of the language used by the officers on the Departmental computers, such as "I've got to go to the station and take a crap." (Plaintiff's Response to Defendant's SMF ¶ 69.) During the series of meetings, the Deputy Chief was given the opportunity to retire. (Defendant's SMF ¶ 59; Plaintiff's SMF ¶ 61.) Retirement was presented as an option for the Deputy Chief if she believed it would be too difficult to move the

plan forward positively. (Defendant's SMF ¶ 59.)

On March 8, 2005, Jordan, Drennen–Bates, Chief Googins and Deputy Chief Berry met again to discuss available alternatives for handling the employees' complaints. (*Id.* ¶ 70.) At this meeting, the Deputy Chief's input was sought and all participants offered suggestions for a plan. (*Id.* ¶ 71.) The Deputy Chief made suggestions for changes in the Department, including the firing of some staff and elimination of the "Officer of the Month" award. (*Id.* ¶ 72.) When asked whether the perception that she was unfriendly was because she was a woman, the Deputy Chief responded: "[N]o it's because I'm the disciplinarian." (*Id.* ¶ 74.) By this time, the Deputy Chief had acknowledged in her own mind that she needed to work on communicating with the officers under her control.[10] (*Id.* ¶ 75.) Plaintiff also believed there to be "serious" personnel issues and several equipment problems that needed to be addressed in the Police Department. (Defendant's SMF ¶ 75.) Drennen–Bates explained to the Deputy Chief that she was not going to be disciplined for her role in the Smith Complaint, but that there would need to be changes in the organization going forward. (*Id.* ¶ 77.)

Plaintiff also believed that the administration should confront head-on some of the issues that had been raised that she believed were unfounded. (*Id.* ¶ 78.) In light of the climate in the Police Department, the other members of the group believed that it was important to look forward and address the perceived problems of the rank and file without confrontation.

(*Id.* ¶ 79.) Instead of refuting the allegations, they believed that regardless of whether the perceptions were accurate, if people thought there was a problem, they needed to fix it. (*Id.* ¶ 79.)

During the course of the meetings, the Deputy Chief was asked why she felt like she was the focus of the Unions' complaints. (*Id.* ¶ 80.) The Deputy Chief responded that she felt that the complaints would have been filed against any person who held her position and that she felt her position was similar to that of an assistant high school principal in charge of discipline. (Defendant's SMF ¶ 80.) The Deputy Chief specifically stated that it was her belief that the complaints that had been filed against her had nothing to do with her gender. (*Id.* ¶ 81.)

Because a number of the complaints against the Chief were that he was disconnected and not fully aware of what was going on in the Department, Jordan asked him to review how he could be more involved in the day-to-day operations. (*Id.* ¶ 82.) Chief Googins suggested reorganizing the Department so that the Patrol and Command divisions would report directly to him. (*Id.* ¶ 84.) Chief Googins recommended that the Detective Bureau, the Special Training, Policies, IA, Dispatch and civilian personnel would continue to report to the Deputy Chief. (*Id.* ¶ 85.) The Chief suggested reorganizing the Police Department, as he explained during the March 8 meeting, primarily for three reasons: (1) he wanted to involve himself more in the day-to-day operations of the Department; (2) this was a structure he had been advocating for years;[11] and (3)

---

10. Drennen–Bates offered to assist the Deputy Chief with her relationships with other officers. (Defendant's SMF ¶ 76.) Drennen–Bates stated to the Deputy Chief that they were "a team." (*Id.* ¶ 77.)

11. Chief Googins had previously advocated a change in the reporting structure wherein there would be two Deputy Chiefs. (Defendant's SMF ¶ 87; Plaintiff's Response to Defendant's SMF ¶ 87.) In 2001, Chief Googins had recommended a similar reorganization to

he wanted to remove the Deputy Chief "from the line of fire." (*Id.* ¶ 86.) Jordan believed that the reorganization was an appropriate response to the serious concerns that the Chief was not sufficiently involved in the day-to-day operations of the Department. (Defendant's SMF ¶ 92.)

With regard to the comment about removing the Deputy Chief from the "line of fire," the Chief explained that removing responsibility for the Patrol Division would give Plaintiff the opportunity to focus on improving her relationship with the Dispatch Division.[12] (*Id.* ¶ 93.) The Chief made these comments at a time when the union was threatening to hold a vote of no confidence against the Deputy Chief, as he had some desire to protect the Deputy Chief from the union, but this was not because the Deputy Chief was a woman. (*Id.*) The Chief believed that removing the Patrol Division from the Deputy Chief's command would allow the anger and mistrust directed at the Deputy Chief to subside. (*Id.* ¶ 94; Plaintiff's Response to Defendant's SMF ¶ 94.) Jordan believed that as a result of the proposed organization changes and over a period of time, trust would be rebuilt, morale would improve and relations would move on. (Defendant's SMF ¶ 94.) The reorganization, however, was intended to be permanent and there would be no opportunity for Deputy Chief Berry to regain her former position. (Plaintiff's Response to Defendant's SMF ¶ 94.)

In the middle of March 2005, another meeting was scheduled. (Defendant's SMF ¶ 95.) Jordan, through Chief Goo-gins, informed the Deputy Chief that the purpose of the meeting was to discuss management business and to craft a plan to move the Department forward. (*Id.* ¶ 96.) The Deputy Chief was asked to attend the meeting, but declined to do so as she was not permitted to bring an attorney because the meeting was to discuss management issues. (*Id.* ¶ 97.) The meeting proceeded without the Deputy Chief. (*Id.* ¶ 98.) At this meeting the decision was made, subject to review of the plan and the advice of counsel, to reorganize the Department in accord with a thirteen point plan. (*Id.*) Chief Googins was directed to prepare and present the proposed organizational changes to Jordan. (*Id.* ¶ 99.)

## E. Results of the investigation

A staff meeting was scheduled for March 24, 2005 at which the Chief was going to explain the organizational changes. (Defendant's SMF ¶ 102.) Prior to the Chief's announcement of the reorganization to the Department, Jordan told him that he needed to stand up in front of the troops and take responsibility for the situation. (*Id.* ¶ 103.) At the meeting, the Chief distributed a memorandum and made a presentation in which he acknowledged that there were problems, described the organizational changes and assured the work force that the administration was committed to addressing their concerns. Drennen–Bates, Jordan and the Deputy Chief attended the meeting but did not participate. (*Id.* ¶ 104.)

the City Manager; the proposed changes, however, were not accepted at that time for fiscal reasons because the proposal required the addition of a new supervisory-level position. (Defendant's SMF ¶ 88.) Chief Googins had also been trying to institute an office of Professional Standards for some time. (*Id.* ¶ 89.)

12. The Patrol Division and the Dispatch Division were the two divisions that were reportedly unhappy with the Deputy Chief. (Defendant's SMF ¶ 93.) Eighty-five percent of the officers in the Patrol Division expressed concern with regard to the Deputy Chief. (*Id.* ¶ 43.)

On March 22, 2005, Drennen–Bates issued her memorandum to Jordan concerning Sergeant Smith's harassment complaint. In that memorandum, she reported that her investigation revealed "a clear sense of Administration not supporting staff—'we are guilty until proven innocent,' and 'looking' for things to write officers up for." (*Id.* ¶ 101.) She concluded, among other things:

The incidents cited in the formal complaint do not meet the definition of hostile work environment under Federal law. However, the evidence I obtained in this investigation clearly portrays a serious managerial problem. I recommend prompt and remedial action to address this, specifically to include a letter to the Chief with notice that this is unacceptable [sic] work environment and management must immediately work on correcting this problem. Further, the Chief should provide a letter to the Deputy Chief outlining what is expected of the Deputy's performance and provide coaching suggestions to correct unacceptable behavior.

(*Id.*)

On April 3, 2005, Jordan sent Chief Googins a memorandum entitled, "State of Current Affairs in the South Portland Police Department." (*Id.* ¶ 105.) The memorandum outlined four areas of concern: communication, the internal investigations process, the reorganization plan and radios/communication in the field. (Defendant's SMF ¶ 108.) For each area, the memorandum set out an action plan for the Chief to follow. (*Id.*) The memorandum concluded: "With these changes I have the confidence that we can improve the working environment for our employees and restore their faith in our commitment and concern for them." (*Id.*)

Upon receipt of the memorandum, the Chief began preparation of a memorandum to the Deputy Chief. (*Id.* ¶ 109.) The memorandum to the Deputy Chief was not sent until April 13, 2005, after the decision to reorganize the Police Department had already occurred. (*Id.*) While acknowledging that a hostile work environment had not been found regarding the Smith Complaint, the Chief went on to state that "a number of issues were identified during the course of the investigation that require both immediate and decisive action. How we respond to these issues will have a profound impact on the future of this organization." (*Id.* ¶ 110.) He concluded: "[T]ogether we can improve the working environment for our employees and we can regain their trust and restore their faith in our commitment and concern for them." (Defendant's SMF ¶ 110.) Chief Googins explained to the Deputy Chief that that plan moving forward was not disciplinary in nature and specifically told her that the memorandum he sent to her was not considered to be a reprimand and would not become part of her personnel file. (*Id.* ¶ 111.) The Deputy Chief did not receive a letter of reprimand but did receive a directive for future action, which was not placed in Plaintiff's personnel file. (*Id.* ¶¶ 112, 113.)

Jordan suggested that the Deputy Chief meet with Union leadership. (*Id.* ¶ 123.) Jordan told the Deputy Chief that he thought it would be nice if she apologized but that he would not order her to apologize during that meeting. (*Id.* ¶ 124.) He did insist that she communicate her commitment to following the thirteen point reorganization and plan for change, moving forward and addressing the serious problems within the Department. (*Id.;* Plaintiff's Response to Defendant's SMF ¶ 67.) The Deputy Chief met with Union officials on April 6, 2005 and acknowledged that there had been communication problems and assured the group that she want-

ed to be part of the solution. (Defendant's SMF ¶¶ 125, 126.) The Deputy Chief also stated that she was not going to resign and that she had not been asked to resign. (*Id.* ¶¶ 127, 128.) She stated that she had not been disciplined and that she was not going to leave the South Portland Police Department. (*Id.* ¶¶ 130, 131.)

## F. The Reorganization

Under the Chief's reorganization plan, which was approved by the City Council, two new Lieutenant positions were created and the City's Police Department essentially was split into two divisions: (1) Patrol and Community Services, and (2) Investigative and Support.[13] (*Id.* ¶ 116.) Under the reorganization, one of the new Lieutenants was responsible for the newly created Office of Professional Standards, which encompassed internal investigations and the development of internal policies. (*Id.* ¶ 121.) The Chief, Drennen–Bates and Jordan have identified several different reasons for reorganizing the Department. (Plaintiff's SMF ¶ 67.)

After the reorganization, the Deputy Chief was responsible for oversight of detective investigations, communications, civilian personnel, dispatch, the administrative secretary and records, park rangers and crossing guards. (Defendant's SMF ¶ 117.) Plaintiff also oversaw the Officer of the Month and Year programs and maintained Department attendance records. (*Id.*) She served as a representative of the Safety Committee. (*Id.*) She was also given the opportunity to coordinate work on three new projects, including leading the Radio Committee, serving as representative on the regional dispatch initiative and leading an effort to replace the records management and computer aid dispatch systems. (*Id.*) Nonetheless, as a result of the reorganization, the Deputy Chief lost the day-to-day oversight and the majority of her duties related to the Patrol Division. (Plaintiff's SMF ¶ 59.) In addition, she was no longer responsible for Internal Investigations.[14] (*Id.*) The Deputy Chief was told to tell the Unions that she was willing to work to resolve the issues, but she was told not to attend any further meetings with the Unions. (*Id.*) The details of the Deputy Chief's restructured job were well known in the Maine Police community. (*Id.* ¶ 51.)

There was no change in the Deputy Chief's rate of pay or in the benefits she received. (Defendant's SMF ¶ 117.) The Deputy Chief has not been directed to cease attending staff meetings. (*Id.* ¶ 142.) The Deputy Chief was never told that she had to resign from the Police Department, nor has anyone ever told the Deputy Chief that they wanted her out of the Police Department because she is a woman. (*Id.* ¶¶ 129, 132.) Plaintiff has never been told that she could not be Chief of Police for the City of South Portland in the future. (*Id.* ¶ 139.)

The Deputy Chief continued to serve in the Chief's place when he was not available. Since the reorganization, the Deputy Chief has in fact taken command of the

---

13. A copy of the reorganization plan was presented to the South Portland City Council during the budget process because it recommended that two Sergeant's positions be upgraded to Lieutenant's positions. (Defendant's SMF ¶ 115.)

14. In Plaintiff's Statement of Material Fact ¶ 52, Plaintiff proffers that "while Deputy Chief Berry retained the titular rank of Deputy Chief, she was, in fact, demoted to the actual rank of Lieutenant." (Plaintiff's SMF ¶ 52.) In support, Plaintiff cites the deposition of Chief Googins, wherein he indicated that the Deputy Chief has substantially fewer assignments than she did before the reorganization. This does not support, however, Plaintiff's Statement of Material Fact ¶ 52.

Police Department when the Chief has been out of town. (*Id.* ¶ 118.) Under the reorganization, Chief Googins remained in overall command of the Police Department. (*Id.* ¶ 119.) He assumed direct supervision over the Patrol Division and supervises the three patrol Lieutenants. (Defendant's SMF ¶ 119.) He relinquished his responsibilities on coordinating work with the Radio Committee and also shared his position as representative on the regional dispatch initiative. (*Id.*) There was no change in his rate of pay or in the benefits he received. (*Id.;* Plaintiff's SMF ¶ 59.)

### G. Evidence of sex discrimination in the South Portland Police Department

The City has policies prohibiting sexual discrimination and sexual harassment. (Plaintiff's SMF ¶ 143.) Since 1994, Chief Googins and Jordan have drafted and instituted an affirmative action plan in order to promote or advocate for more women in the command structure of the Police Department. (Defendant's SMF ¶ 144; Plaintiff's Response to Defendant's SMF ¶ 144.) Yet since that time, there have been no appointments of female officers to either the police command structure or to the position of Sergeant. (Defendant's SMF ¶ 144; Plaintiff's Response to Defendant's SMF ¶ 144.)

In the South Portland Police Department, there is a "code of silence," that is gender related. (Plaintiff's SMF ¶ 16.) The Deputy Chief did not follow the "code of silence" in administering the Internal Investigations process, which caused concern among those who followed the "code." (*Id.* ¶ 17.) In addition, members of the Police Department used the term "skirt work" to refer to clerical type work typically done by women. (*Id.* ¶ 50.)

Historically, Chief Googins has supported and protected his male supervisors, including Deputy Chiefs, in the Police Department from criticism and trouble. (Defendant's SMF ¶ 141.) By way of example, he protected a former officer from rumors that had been circulating about an affair. (*Id.*) Neither Jordan, Drennen–Bates nor the Chief publicly defended Plaintiff or attempted to correct the misinformation that was spread about her. (Plaintiff's SMF ¶ 65.)

Before the reorganization, Jordan was shown a picture of then-Assistant City Manager Lauren Carrier labeled "Asshole of the Month," which was posted on the City's intranet. (*Id.* ¶ 3.) Jordan took no action to have it deleted and it is still posted on the City's intranet. (*Id.*) Jordan neither reprimanded nor disciplined the individual responsible for posting the offensive picture. (*Id.* ¶ 4.) Jordan believed that the picture was a joke and done out of humor and in jest. (*Id.* ¶ 5; Defendant's Reply to Plaintiff's SMF ¶ 5.) The same label previously was given to City Manager Jordan. (Defendant's Reply to Plaintiff's SMF ¶ 5.)

After the reorganization, Plaintiff received an e-mail that she perceived as offensive ("the traffic accident e-mail"). (Plaintiff's SMF ¶ 48; Defendant's Reply to Plaintiff's SMF ¶ 48.) She brought the e-mail to the attention of the Chief, who believed that it was inappropriate and that it had to be dealt with, but Chief Googins did not recall the precise disposition of this incident. (Plaintiff's SMF ¶ 49; Defendant's Reply to Plaintiff's SMF ¶ 49.)

On April 10, 2005, the Deputy Chief submitted a complaint alleging harassment against Drennen–Bates and Jordan to the South Portland City Council regarding the Drennen–Bates investigation. (Defendant's SMF ¶ 133; Plaintiff's SMF ¶ 36.) Upon receipt of the Deputy Chief's com-

plaint, the City Council hired two investigators, William McLaran and Lisa Beecher, both of whom were current or retired Chiefs of Police, to conduct an investigation into the harassment allegations. (Defendant's SMF ¶ 135; Plaintiff's SMF ¶ 37.) The Deputy Chief had a full and fair chance to explain her story to McLaran and Beecher during their investigation. (Defendant's SMF ¶ 136.) Plaintiff also attended a City Council hearing on August 29, 2005 with her attorney during which McLaran and Beecher presented their report to the City Council. (*Id.* ¶ 137; Plaintiff's SMF ¶ 40.)

On December 27, 2006, Plaintiff filed a Complaint naming the City of South Portland, Chief Googins and City Manager Jordan as Defendants. (Docket # 1.) On April 26, 2007, Plaintiff filed a Second Amended Complaint naming only the City of South Portland as Defendant.[15] (Docket # 12.) The Second Amended Complaint asserts causes of action for violation of federal sex discrimination laws (Count I), state sex discrimination laws (Count II), deprivation of a property right without due process (Count III) and loss of professional advantage and reputation without due process (Count IV). On July 25, 2007, Defendant City of South Portland moved for summary judgment on all counts. (Docket # 17.)

## II. STANDARD OF REVIEW

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni v. Potter,* 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

## III. DISCUSSION

Initially, the Court pauses to note that it is less than clear from Plaintiff's Objection to Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law ("Plaintiff's Objection to Summary Judgment") (Docket # 40) what specific

---

**15.** On January 31, 2007, Plaintiff filed an Amended Complaint that did not name Chief Googins or City Manager Jordan as Defendants.

causes of action she is actually pursuing. Plaintiff's Objection to Summary Judgment appears to follow the analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for disparate treatment cases under Title VII where direct evidence of discrimination is lacking. *See Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996). Within this discussion, however, Plaintiff suggests that there is direct evidence of discrimination, which implicates a different analysis. *See id.* at 95–96. Plaintiff also hints that she may have been the victim of a hostile work environment. Finally, aside from scant references to due process, which lack any legal analysis, Plaintiff has failed to address her claims for violation of due process. This confusion is compounded by the problems referenced above with respect to Plaintiff's Statement of Material Facts. Nonetheless, the Court will attempt to address each of the various causes of action in turn.

## A. Sex Discrimination

Counts I and II of Plaintiff's Second Amended Complaint assert causes of action for sex discrimination in violation of federal (Count I) and state (Count II) laws. Title VII of the Civil Rights Act ("Title VII") of 1964, 42 U.S.C. § 2000e *et seq.*, makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.* (2007), similarly provides that it is unlawful employment discrimination for an employer to discriminate against an employee on the basis of sex "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment." 5 M.R.S.A. § 4572(1)(A) (2007). Maine courts have relied on federal case law surrounding Title VII for the purpose of construing and applying the provisions of the MHRA. *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me.1992). Accordingly, the Court will apply the same legal standard in considering whether the case survives summary judgment under both federal and state law. *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n. 3 (1st Cir.1997).

### 1. Disparate Treatment

At the heart of this case lies the reorganization of the Police Department and the alleged disparate treatment Plaintiff received as a result. In a disparate treatment case under Title VII where direct evidence of discrimination is lacking,[16] the Court will utilize the burden-shifting framework articulated in *McDonnell*

---

16. As previously stated, Plaintiff suggests at one point that there is direct evidence of discrimination in this case. Again, it is less than clear from Plaintiff's Objection to Summary Judgment what exactly she claims constitutes direct evidence. Nonetheless, the First Circuit has stated that "the term 'direct evidence' normally contemplates only those 'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" *Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir.2002) (quoting *Melendez–Arroyo v. Cutler–Hammer de P.R. Co.*, 273 F.3d 30, 35 (1st Cir.2001)); *see also Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 96 (1st Cir.1996) (stating that "direct evidence is evidence which, in and of itself, shows a discriminatory animus"). After a thorough review of the summary judgment record, there is simply no direct evidence that a decisionmaker made a statement that directly reflected the animus of sex and bore squarely on the decision to reorganize the Police Department.

Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie showing of discrimination. *Id.* at 802, 93 S.Ct. 1817. A prima facie showing creates a presumption of discrimination, upon which the burden of production shifts to Defendant to show a legitimate, nondiscriminatory reason for the adverse employment action. *Ayala–Gerena*, 95 F.3d at 95. Once the employer has offered an alternative reason for the adverse employment action, "[a]ll that remains is for the plaintiff to show that the adverse employment action was the result of discriminatory animus." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir.2003).

■ For Plaintiff to establish a presumption of gender discrimination, she must show: (1) that she is a member of a protected class; (2) that she performed her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that she was treated differently from similarly situated men. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir.2001). Defendant City of South Portland does not contest that Plaintiff is a member of a protected class and that she performed her job satisfactorily.[17] Defendant contends, however, the Plaintiff did not suffer an adverse employment action.

■ "To be adverse, an action must materially change the conditions of plaintiff['s] employ. Material changes include demotions disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Gu v. Boston Police Dep't*, 312 F.3d 6, 14

(1st Cir.2002) (internal citations and quotations omitted). The inquiry into whether an employment action was materially adverse is case-by-case and must be cast in objective terms. *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir.1996). "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Id.*

■ Here Plaintiff claims that she was actually and constructively demoted. Specifically, Plaintiff states that prior to the reorganization, she effectively ran the entire Police Department, including the Detective Bureau, Internal Investigations, the Dispatchers, civilian employees and the Patrol Division. After the reorganization of the Police Department, Plaintiff was no longer responsible for the Patrol Division or Internal Investigations. In addition, Plaintiff was told not to attend further meetings with the Unions. Plaintiff asserts that this decrease in responsibilities and supervisory authority amounts to a material change in her employment.

Even with the loss of Patrol and Internal Investigations, Plaintiff maintained a large amount of supervisory authority within the Department. The First Circuit has made clear that only a dramatic decrease in supervisory authority will constitute an adverse employment action. *See Gu*, 312 F.3d at 14 (finding that the loss of some supervisory authority as a result of a restructuring is insufficient for an adverse employment action). After the reorganization, the Deputy Chief was responsible for oversight of detective investigations, communications, civilian personnel, dispatch, the administrative secretary and records, park rangers, crossing guards, oversaw

---

**17.** Nonetheless, Plaintiff inexplicably spends three of eighteen pages arguing that she is a member of a protected class and performed her job adequately.

the Officer of the Month and Year programs, maintained Department attendance record and served as a representative of the Safety Committee. The changes to Plaintiff's supervisory responsibilities after the reorganization do not amount to an adverse employment action. *See id.*

Plaintiff remains the Deputy Chief of Police for the South Portland Police Department and has served in place of the Chief in his absence. In addition, following the reorganization, Plaintiff was given the new additional opportunities of leading the Radio Committee, serving as representative on the regional dispatch initiative and directing an effort to replace the records management and computer aid dispatch systems. Plaintiff claims that this reorganization resulted in a decrease of seventy-five percent of her responsibilities and an actual demotion. On the summary judgment record, Plaintiff has failed to substantiate that the reorganization resulted in such a decrease of responsibility.

Rather, it is clear that the reorganization resulted in a reshuffling of responsibilities among the Police Department administration. The Chief assumed greater day-to-day control and contact with the Department while giving up other responsibilities, such as coordinating work with the Radio Committee. Similarly, Plaintiff relinquished some responsibilities and gained others. A mere reshuffling of responsibilities, on its own, is insufficient to establish an adverse employment action.[18] As the First Circuit has stated, "[w]hen a

general reorganization results in some reduction in job responsibilities without an accompanying decrease in salary, or grade, those changes cannot be dubbed adverse employment actions." *Gu,* 312 F.3d at 14. Further, it is clear from the summary judgment record that the Plaintiff did not suffer a decrease in pay or benefits. *See Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (cited approvingly in *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 23 (1st Cir.2002) ("[A] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.")). Objectively, the reorganization did not result in a material change in Plaintiff's employ. While her responsibilities were changed, "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady,* 993 F.2d at 136.

■ Plaintiff also claims that the details of her restructured employment were well known in the police community and thus she suffered a loss of prestige. Yet, there is no support for her claim of loss of prestige other than her argument that she was demoted. Plaintiff cites the recent Fifth Circuit decision, *Alvarado v. Texas Rangers,* for support. 492 F.3d 605 (5th

---

**18.** Similarly, in *Torres–Martinez v. Puerto Rico Dep't of Corrs.,* Plaintiff asserted claims for political discrimination and violations of the Fourteenth Amendment due process rights. 485 F.3d 19, 21 (1st Cir.2007). Although the demonstration of an adverse employment action requires a showing that the employment decision resulted "in conditions 'unreasonably inferior' to the norm for that position" under a claim for political discrimination, the

case is nonetheless instructive. *Id.* at 23 (internal citations and quotations omitted). In *Torres–Martinez,* Plaintiff's supervisor decided to exercise more of the duties that he shared with her, which left Plaintiff with fewer responsibilities. *Id.* at 23–24. The First Circuit held that the "perceived slights and alleged alterations in duties" was insufficient to establish an adverse employment action. *Id.* at 24.

Cir.2007).[19] There, the Court stated that "[a] plaintiff's subjective perception that a demotion has occurred is not enough." *Id.* at 614 (quotations and citations omitted). Here, Plaintiff's subjective belief alone supports that she has been demoted and that she has suffered a loss of prestige. It is not enough that Plaintiff felt that she had been disciplined by the reorganization and had lost prestige in her employment. *See Marrero,* 304 F.3d at 25 ("It is not enough that [the plaintiff] felt stigmatized and punished by the transfer. A more tangible change in duties or working conditions is needed before we can conclude that the transfer was, in substance, a demotion." (internal quotations omitted)). As the First Circuit has indicated in relation to a Title VII constructive discharge claim, Title VII does not protect a worker's ego. *See Caputo v. City of Haverhill,* 67 Fed.Appx. 1, 4 (1st Cir.2003). Therefore, Plaintiff has failed to raise a genuine issue of material fact with regard to whether she suffered an adverse employment action. Plaintiff has failed to establish a prima facie case of discrimination, and the Court need go no further. Defendants are entitled to summary judgment on any claim of disparate treatment.

## 2. Hostile Work Environment

Defendant claims that Plaintiff's Second Amended Complaint "only charges that the city engaged in a discrete act of discrimination when it reorganized the police department." (Defendant's Reply Memorandum in Support of its Motion for Summary Judgment (Docket # 47) at 5.) Plaintiff's Objection to Summary Judgment,

however, indicates that she may be attempting to pursue a claim for hostile work environment. Although the exact contours of Plaintiff's hostile work environment claim are not obvious or apparent, the Court will nonetheless briefly consider the underlying argument.

■ In order to establish a claim for hostile work environment, the plaintiff must present facts to establish the following:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001). Defendant does not contest that Plaintiff is a member of a protected class. Although Plaintiff fails to specifically articulate those actions that she believes constitute actionable sexual harassment, the Court understands from Plaintiff's argumentation that this claim encompasses, at most, a gender-related "code of silence," the "Asshole of the Month" picture, references to "skirt work," a traffic accident e-mail and a denial of support from the administration.[20]

---

19. In *Alvarado,* the Fifth Circuit addressed "what distinguishes a lateral transfer from a promotion" and stated that "[t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves *objectively* worse—such as being less prestigious or

less interesting or providing less room for advancement." *Id.* at 612, 613 (quoting *Sharp v. City of Houston,* 164 F.3d 923, 933 (5th Cir.1999) (emphasis added)).

20. Plaintiff further argues that the Police Department has a documented history of hostility toward women, but Plaintiff failed to pro-

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, at the threshold Plaintiff must show that the discrimination was because of her sex. This is not a case where "the inference of discrimination is easy to draw [as] in most male-female sexual harassment situations ... [where] the challenged conduct typically involves explicit or implicit proposals of sexual activity...." *Id.* At the same time, the harassing conduct need not have been "overtly sex-specific in content to be actionable under Title VII." *Rivera–Martinez v. Puerto Rico*, —— Fed.Appx. ——, ——, 2007 WL 16069, at *3, 2007 U.S.App. LEXIS 160, at *8 (1st Cir. Jan. 4, 2007). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998.

Plaintiff must also establish that the harassment was "sufficiently severe or pervasive [as] to alter the conditions of [her] employment." *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 82 (1st Cir.2001) (internal quotations and citations omitted). There is no "mathematically precise test" for determining when conduct in the workplace moves beyond the "merely offensive"

and enters the realm of unlawful discrimination. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Rather, the question whether the environment is objectively hostile or abusive must be answered by reference to all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367; *see also Oncale*, 523 U.S. at 81–82, 118 S.Ct. 998.

■ For several of Plaintiff's proffered instances of sexual harassment, Plaintiff has failed to provide sufficient evidence on the record with regard to the "because of sex" and/or the "severe or pervasive" requirements. With regard to the "code of silence," Plaintiff baldly states that her failure to follow the "code of silence" caused concern among those who followed the code. The Court is aware of the general meaning of a "code of silence," but here Plaintiff fails to articulate any context for the gender-related "code of silence," how it is gender-related, its contours, frequency, implications or consequences. *Cf. Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83–84 (1st Cir.2006) (noting that the inquiry into whether harassment is sufficiently severe or pervasive is a fact specific inquiry that should consider the frequency, se-

---

vide admissible evidence to substantiate that claim. For example, at various points, Plaintiff states that Jordan has himself been the subject of sex discrimination complaints and tolerates an environment hostile to women. The record on summary judgment, however, does not support Plaintiff's characterization. Instead, the record supports that at some point in the past, five employees made a complaint that the former Assistant City Manager, Lauren Carrier, was creating a hostile work environment and that Jordan's relationship with her made it difficult for him to be objec-

tive in overseeing her. (Plaintiff's SMF ¶ 2; Defendant's Reply to Plaintiff's SMF ¶ 2.) An independent investigation was conducted into the allegations, and no action of any kind was taken against Jordan as a result of the complaint. (*Id.*) In addition, some of the documents on which Plaintiff relies to substantiate this allegation are those missing from the docket and the record while others appear to be entire police files, which the Court declines to wade through without the assistance of Plaintiff.

verity and whether it interfered with an employee's work performance). Similarly, while the label "Asshole of the Month" may be offensive, Plaintiff has simply indicated that some form of the picture remains on the City's intranet, but has failed to state how this harassment was because of her sex or how it impacts her employment in any way. *See Lee–Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 46 (1st Cir.2003) (affirming summary judgment for the employer in a hostile work environment case where there was no evidence that the harassment was "an impediment to [Plaintiff's] work performance"). The Court notes that the label was given to the male City Manager one year and the female Assistant City Manager the following year. Plaintiff's proffers related to the "code of silence" and the "Asshole of the Month" picture leave the Court with little to consider or analyze owing simply to Plaintiff's failure to provide evidence on the summary judgment record related to these events. Setting aside those instances of harassment for which Plaintiff fails to provide sufficient evidentiary support to show that the harassment was because of her sex or severe or pervasive, the Court is left with references to "skirt work," the traffic accident e-mail and the general allegations related to the denial of support by the administration.

■ It is clear that isolated incidents (unless extremely serious) and offhand comments are not sufficient to establish a hostile work environment. *O'Rourke*, 235 F.3d at 729. Plaintiff asserts that the Department referred to administrative and/or clerical work as "skirt work." Yet beyond one instance of use of the term by a female employee of the Department, Plaintiff fails to provide the frequency, the manner or the conditions under which references to skirt work were made. Plain-

tiff has failed to show that references to "skirt work" were anything more than offhand comments. Similarly, after the reorganization, Plaintiff received an e-mail with an offensive traffic accident video. She brought the e-mail to the attention of the Chief, who believed that it was inappropriate and that it had to be dealt with, but Chief Googins did not recall the precise disposition of the incident. Plaintiff has not indicated that this was part of a pattern of offensive e-mails or that it was physically threatening or humiliating. In short, Plaintiff has failed to show, or claim, that the traffic accident e-mail was more than a single isolated incident.

In addition, Plaintiff asserts that the failure of Googins, Jordan and Drennen–Bates to dissuade members of the Department of their erroneous conclusions supports her claim of hostile work environment. In evaluating a hostile environment claim, the Court is encouraged to consider all of the circumstances. *Oncale*, 523 U.S. at 81, 118 S.Ct. 998; *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Plaintiff points out that Chief Googins had supported and protected his male supervisors from criticism, including an incident where the Chief attempted to put an end to rumors regarding a prior Deputy Chief's affair. The Court notes that the specific examples are not sufficiently similar to form a valid basis for comparison. Further, the Court cannot view the failure of Googins, Jordan or Drennen–Bates, to correct perceived wrong conclusions in isolation. While a denial of support can contribute to a hostile work environment, *O'Rourke*, 235 F.3d at 730, here the broader context of the morale problems within the Department and the following reorganization is relevant. Defendant explains that confronting individuals regarding any erroneous beliefs would further harm the morale within the Department. Thus, the failure to support was limited to a difficult time

within the Police Department and a desire to limit the reach of the bad morale. In addition, Plaintiff has failed to indicate how the denial of support was because of her sex as required. *See Oncale*, 523 U.S. at 80, 118 S.Ct. 998.

The Court is unable to find a trialworthy issue here. Taking the sufficiently supported harassment collectively, the Court finds that Plaintiff has failed to generate a genuine issue of material fact as to whether the harassment was severe or pervasive. Instead, Plaintiff's hostile environment claim suffers from a deficiency common to this case, Plaintiff's reliance on conclusory allegations and unsubstantiated argumentation. Thus, while Plaintiff's experience may have been unpleasant at times, the record does not support the inference that the environment was objectively hostile to Plaintiff because she was a female.

Plaintiff has failed to raise a genuine issue of material fact with regard to either disparate treatment or hostile work environment sex discrimination. Because the standard is the same under both federal and state law, Plaintiff has failed on both Counts I and II. Therefore, Defendant, City of South Portland, is entitled to summary judgment on Counts I and II.

## B. Due Process

Counts III and IV of Plaintiff's Second Amended Complaint assert causes of action for violation of Plaintiff's due process rights. Plaintiff's Objection to Summary Judgment fails to address why summary judgment should not be granted on these claims as requested by Defendant. Indeed, Plaintiff makes only passing references to potential violations of due process and fails to substantiate the claims to any extent. Plaintiff has therefore waived any claim premised on a violation of her due process rights. *See Grenier v. Cyanamid*

*Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived. 'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'" (quoting *Vaughner v. Pulito*, 804 F.2d 873, 877 n. 2 (5th Cir.1986))); *Muniz–Cabrero v. Ruiz*, 23 F.3d 607, 609 (1st Cir.1994) ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." (citation and quotations omitted)). Therefore, Defendant is entitled to summary judgment on these claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED (Docket # 17).

**SO ORDERED.**